T.C. Memo. 2018-61

UNITED STATES TAX COURT

DYNAMO HOLDINGS LIMITED PARTNERSHIP,
DYNAMO, GP, INC., TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BEEKMAN VISTA, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2685-11, 8393-12.          Filed May 7, 2018.

<u>Martin R. Press</u>, <u>Edward A. Marod</u>, <u>Clinton R. Losego</u>, <u>Lu-Ann M. Dominguez</u>, <u>Alan S. Lederman</u>, and <u>John W. Terwilleger</u>, for petitioners.

<u>David B. Flassing</u>, <u>Lisa M. Goldberg</u>, <u>William G. Merkle</u>, <u>Timothy A. Sloane</u>, and <u>G. Roger Markley</u>, for respondent.

[*2]       MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, Judge:  The Moog family has been very successful in real estate development.  Their real estate business originated in Canada.  When it expanded into the United States, they created U.S. subsidiaries under the Canadian structure.  Over time some family members and beneficial owners of the Canadian structure moved to the United States.

The Canadian structure proved to be very tax inefficient, particularly when income was distributed (or deemed to be distributed) up the Canadian ownership chain.  To cure this inefficiency, the family created a U.S.-based structure and began shifting assets to that new structure.  The asset transfers took place during 2005, 2006, and 2007, the years in issue in these cases.[1]  In particular, U.S. subsidiaries within the Canadian structure made advances to entities within the U.S.-based structure to fund Dynamo's operations.  Also, entities within the Canadian structure sold income-producing assets to entities within the U.S.-based structure.  Over time, the effect was to shift the U.S.-based income to the U.S.-based structure.

---

[1]The years in issue for Dynamo Holdings Limited Partnership are 2005, 2006, and 2007.  The years in issue for Beekman Vista, Inc., are 2005 and 2006.

**[*3]** The Commissioner argues that this planning was improper. The Commissioner makes two principal arguments. First, the Commissioner argues that the advances to the U.S.-based structure were not bona fide loans. Instead, the Commissioner argues that we should treat the advances as gifts. The Commissioner argues that this treatment would result in deemed distributions up the Canadian ownership chain followed by deemed gifts to the owners of the U.S.-based structure and deemed contributions to the U.S.-based structure. The Commissioner argues that withholding taxes would apply when the deemed distributions made their way across the border. In addition, the Commissioner argues that some of the assets that were sold to the U.S.-based business were sold below fair market value, giving rise to gifts that are subject to this triangular distribution theory.

We find that the advances were bona fide loans. Some of the assets, however, were transferred at less than fair market value.

FINDINGS OF FACT

I.     The Moog Family

The Moog family members are successful real estate developers. Delia Moog is a wealthy Canadian who, during the years in issue, was in her seventies. Mrs. Moog's daughter is Christine Moog, and her nephew is Robert Julien. For

[*4] over half a century, the family successfully developed real estate in Canada, and for over 20 years, they successfully developed real estate in the United States.

Over the years, Mrs. Moog engaged in estate planning. She began making gifts of large portions of her estate in the 1990s, and she continued to do so after the years in issue. She structured many of the gifts as 60/40 splits, giving 60% to her daughter, Christine, and 40% to her nephew, Mr. Julien.[2]

II.    Beekman

During the years in issue, Beekman Vista, Inc. (Beekman Vista), was a corporation wholly owned by a Canadian entity controlled by Mrs. Moog. Beekman Vista was a holding company that owned several property development companies in the United States. We use "Beekman" to refer to the group of entities consisting of Beekman Vista and its U.S. subsidiaries.

Beekman Vista was organized as a Delaware corporation in 1984 to enter the U.S. real estate market. Beekman Vista was a wholly owned subsidiary of a Canadian corporation, Canada Square Management, Ltd. (Canada Square). Canada Square was a wholly owned subsidiary of Kolter Property Co. Kolter Property Co.'s preferred shares were held by 1231024 Ontario, Inc., and Kolter

---

[2]To avoid confusion, we refer to Delia Moog as Mrs. Moog and her daughter Christine Moog as Christine.

**[*5]** Property Co.'s common shares and ownership control were held by 2020072 Ontario, Ltd. 1231024 Ontario, Inc.'s common stock was held in a 60/40 split, with Delia Moog Family Trust holding 60% and Robert Julien Family Trust holding 40%; Mrs. Moog owned all of its preferred shares. 2020072 Ontario, Ltd. was wholly owned by 2020064 Ontario, Ltd. 2020064 Ontario, Ltd.'s nonvoting common stock was held in a 60/40 split with Delia Moog Family Trust #2 holding 60% and Robert Julien Family Trust #2 holding 40%; Mrs. Moog held all of its voting control. Mrs. Moog's ownership of the voting stock of 2020064 Ontario, Ltd. gave her indirect control over Beekman.

Mrs. Moog, Mr. Julien, and Christine were among the beneficiaries of the trusts. Christine was one of the beneficiaries of the Delia Moog Family Trust, and Robert Julien was one of the beneficiaries of the Robert Julien Family Trust. The beneficiaries of the Delia Moog Family Trust #2 and the Robert Julien Family Trust #2 were Mrs. Moog, Christine and her descendant, and Mr. Julien and his immediate family. Mr. Julien and Mrs. Moog were among the trustees of the Robert Julien Family Trust #2 and the Delia Moog Family Trust #2.

Beekman's principal business activity was real estate management and development. Beekman Vista's subsidiaries owned and operated office buildings in Dallas, Texas, and developed residential real estate in south Florida. Beekman

[*6] also held a hedge fund portfolio, the Dynamo Fund, that produced investment income. The hedge fund had lockup periods, which limit an investor's ability to redeem the investment. All but one lockup period expired on January 1, 2006.

Beekman's management team has a long track record of profitable real estate projects. The management team operated under the Kolter brand name common to Beekman and its parent companies. Mr. Julien and Mrs. Moog were among the officers and directors of Beekman Vista. Although Mrs. Moog was an officer and director, Mr. Julien and his team primarily handled the development projects.

The Beekman management team members worked together for decades. Mr. Julien had worked in real estate with Kolter since the 1980s, and each of the other members of the team had significant real estate experience before joining Kolter. The management team had a well-defined project selection process; it would not bid on projects until completing due diligence and running financial models that demonstrated that the project would be a worthwhile investment.

By the early 2000s Beekman's business had changed substantially. Beekman sold its Texas and Florida rental properties, and the management team decided to focus its efforts on Florida real estate development.

[*7]  In 2004 Mr. Julien moved to Florida, and the remaining management team members followed.  Beekman also moved its principal office and management team from Canada to Florida.

Following his move, Mr. Julien discussed with legal consultants how to set up a long-term business structure in the United States.  Mr. Julien believed that lending institutions were uncomfortable doing business with foreign companies such as Beekman and that a U.S.-owned structure would provide the lending institutions additional confidence in their projects or business.  The management team was also concerned with talent retention and believed that a U.S. company would better attract and retain younger people.  The management team was also aware of the withholding tax on cross-border distributions from Beekman Vista to Canada Square.  Mrs. Moog decided to form a U.S. partnership.

Beekman continued to operate profitably from 2005 to 2007.  Beekman Vista's estimated earnings and profits for tax years 2005, 2006, and 2007 were $34,504,980, $141,115,279, and $138,406,011, respectively.[3]

III.  Dynamo

Dynamo Holdings Limited Partnership was formed in early 2005 as a Delaware limited partnership.  We use "Dynamo Holdings" to refer to Dynamo

---

[3]All dollar amounts are rounded to the nearest dollar.

[*8] Holdings Limited Partnership, and "Dynamo" to refer to the group of entities consisting of Dynamo Holdings and the entities owned by it. Dynamo Holdings was owned by two trusts that were limited partners and a corporation that was a general partner. The 2005 Christine Moog Family Delaware Dynasty Trust held a 59.9995% limited partnership interest, the 2005 Robert Julien Family Delaware Dynasty Trust held a 39.9995% limited partnership interest, and Dynamo GP held a .001% general partnership interest. The beneficiaries of the U.S. trusts and the Canadian trusts were not identical. Dynamo GP was owned 60% by 2020072 Ontario, Ltd., one of the Canadian corporations indirectly controlled by Mrs. Moog, and 40% by Robert Julien. 2020072 Ontario, Ltd. was the common indirect owner of Beekman and Dynamo.

Dynamo Holdings was a holding company that owned, either directly or indirectly, several single-member limited liability companies that were disregarded for tax purposes. Dynamo Holdings directly held Dynamo, LLC, which directly held Kolter Capital, LLC, which directly held Kolter Communities, LLC, which directly held various property development companies.

When Dynamo Holdings was formed, Mrs. Moog funded the initial contribution by giving cash to the two trusts that funded Dynamo Holdings. Mrs. Moog gave the trusts $100 million in a 60/40 split, transferring $60 million to the

[*9] Christine Moog Dynasty Trust (Christine Dynasty Trust) and $40 million to the Robert Julien Dynasty Trust (Julien Dynasty Trust). Mrs. Moog received the $100 million as a dividend from the Canadian entities. This $100 million provided Dynamo with the means to begin real estate development in the United States.

Dynamo's principal business was real estate development and sales in Florida. The management team was the same as the Beekman team, and it continued to operate under the Kolter brand name. As it had done before, the management team followed a well-defined process to select and bid on profitable projects. It also provided management services to Beekman. The result was that, although Dynamo was a newly formed structure, it had an experienced real estate development team.

For efficiency purposes, Dynamo centralized its operations. The management team had centralized operations for Beekman and the other Canadian companies. With the creation of Dynamo, they implemented the same approach. Not only were the employees and overhead centralized, but the group of entities also centralized their cash management.

To centralize their cash management, one entity would function as the bank, and when the operating companies produced cash from operations, they would

[*10] transfer those profits to the bank. Likewise, the bank would advance cash to the operating entities through intercompany advances. The operating entities would not submit applications, undergo credit checks, or execute promissory notes. The management team did not believe that formal procedures were necessary. Because the borrower and lender had the same management team, the lender had all the details related to each project and the risks associated with lending to its subsidiary or corporate cousin. The intercompany advances were booked to an asset account and to an account labeled as "due from/to" by the lender and the borrower and accrued interest until they were repaid.

IV.    Advances Between Beekman and Dynamo

Upon formation and through the years in issue, Beekman advanced funds to Dynamo, and Dynamo recorded the funds on its ledgers as an account payable to Beekman. The yearend balances of the advances were approximately $240 million, $501 million, and $176 million in 2005, 2006, and 2007, respectively. Some of the funds that Beekman transferred to Dynamo were funds that Beekman had received as loans from Canada Square. The purposes of the advances were to fund operating expenses and to acquire assets.

When Beekman advanced funds to Dynamo, specifically through Kolter Capital and Kolter Communities as the centralized banks, the funds were recorded

[*11] on the general ledgers in the "due from/to" account. Interest accrued on that balance. And when Dynamo made repayments, the repayments were recorded on the general ledgers as well.

Beekman and Dynamo did not follow many customary lending practices. Beekman did not demand payments, require collateral or security, or provide a fixed due date. Beekman would not have forced Dynamo into bankruptcy to collect the debts.

The Beekman and Dynamo management team did not believe that formal lending procedures were necessary. The companies shared a single management team that had full knowledge of and access to both companies' information, and the companies had a the long history of advances and repayments over the years. Given that the management team had control over both the lenders and the borrowers, they believed that formal lending procedures were redundant and unnecessary. They also believed that it was unnecessary to demand payments because past repayments were made without demand.

Beekman and Dynamo treated the recorded transfers as debt. Beekman's management expected that the recorded transfers would be repaid, and Dynamo's management expected to repay the recorded transfers.

**[\*12]** Dynamo made repayments to reduce the outstanding balance each year, and Beekman never took any steps to enforce repayment.  Dynamo repaid Beekman with proceeds Dynamo received from capital contributions.  It also repaid its debts to Beekman by making wire transfers and by paying Beekman's outstanding obligations to third parties.  Finally, Dynamo also repaid by providing management services.  Rather than collect management fees from Beekman only to return them as payment on the debt, Dynamo provided management services and Beekman deducted the cost of those services from Dynamo's outstanding loan balance.

A.    The 2007 Restructuring

In 2007 Dynamo engaged in a series of transactions that restructured the advances to more accurately reflect the advances.  As part of the transactions, Beekman and Dynamo executed restructuring documents, including promissory notes evidencing the prior advances.  These agreements were executed by February 2008 and would not have been created if the restructuring transactions had not occurred.

[*13] In the restructuring documents, Beekman and Dynamo agreed that Beekman had previously lent Kolter Capital $500 million.[4] Beekman and Kolter Capital agreed to divide the outstanding balance into three parts, with Dynamo, LLC assuming $220 million through a Dynamo, LLC note; RJ-K Newco, a newly formed Kolter Capital subsidiary, assuming $146,666,667 through an RJ-K Newco note; and Kolter Capital maintaining the remainder, $134 million, of the recorded transfers to Beekman through the Kolter Capital note.[5] The Kolter Capital note was a revolving credit facility, and the Dynamo, LLC and RJ-K Newco notes were demand notes. Each note had required interest to accrue at the London Interbank Offering Rate for U.S. dollar deposits plus 1.85%, payable on the fifth day following demand.

Beekman and Dynamo did not abide by State laws that serve to formalize lending agreements. Dynamo did not pay any State-level document stamp tax on

---

[4]We note that there is an approximately $53 million discrepancy between the amount recorded on the loan documents and the amounts recorded on the general ledgers. The total amount included in the promissory notes for the outstanding advances was $500,666,667, whereas the total outstanding advances reported on Dynamo's general ledger before the restructuring transaction was $554,030,254.

[5]The face amount of the RJ-K Newco note was $146,666,667; however, RJ-K Newco recorded only $146,000,000. We find that the amount of the assumption was only $146,000,000.

[*14] these notes.  Also as part of the restructuring documents, Dynamo and Beekman executed a security agreement; however, the security agreement was never filed with the Florida secretary of state.

In addition to restructuring the outstanding balance, Dynamo Holdings distributed interests in disregarded entities that held amounts substantially equal to the amounts of the notes.  Dynamo Holdings distributed Dynamo, LLC to Christine Dynasty Trust.  Dynamo, LLC held the Dynamo Fund, which had assets worth approximately $220 million.  And Dynamo Holdings distributed RJ-K Newco to the Julien Dynasty Trust, which had $146,666,667 in assets consisting of $70 million cash and a $76,666,667 promissory note.

### B.    General Ledgers

The general ledgers of Beekman and Dynamo reflected the advances. Dynamo booked all of the intercompany advances on its general ledger in a "due to/from" account.  These balances changed daily.  The entries on the general ledger could not be erased or replaced; instead, incorrect entries had to be reversed by adding additional adjustment entries to the general ledger.

At trial petitioners called Steven Moses to explain Dynamo's general ledgers.  Mr. Moses has over 30 years of experience as a certified public accountant and has experience in forensic accounting.  Mr. Moses spent thousands

[*15] of hours analyzing the financial records of Dynamo and Beekman and selected records of Canada Square, each of which maintained separate books. He prepared schedules of all the transactions recorded by Dynamo and Beekman from 2005 to 2011.

Through his review of the financial records, Mr. Moses determined that during the years in issue the yearend outstanding balances were $240,711,225, $501,834,241, and $176,194,052 for 2005, 2006, and 2007, respectively. Because entries could not be erased, Mr. Moses tracked the entries to determine whether they had been reversed or corrected. He concluded that the outstanding balances were entirely repaid by 2011. He also found that in 2006 and 2007 (as well as the years following the restructuring transaction), interest was charged, accrued to the loan balance, and paid as part of the satisfaction of the loans.

For 2005 Mr. Moses determined that the total outstanding balance due was $240,711,225, resulting from $378,242,851 of advances that increased the balance due to Beekman and $137,531,626 in repayment or reductions that decreased the balance due to Beekman. Dynamo recorded all of these transactions but one on December 31, 2005. These amounts were reflected through 55 transfers between Beekman and Dynamo; 16 of those were repayments or adjustments that decreased

[*16] the balance owed to Beekman. Dynamo did not accrue any interest on the outstanding balance in 2005.

For 2006 Mr. Moses determined that the total outstanding balance due was $501,834,241, resulting from $1,248,066,597 in transfers that increased the balance due to Beekman and $986,943,581 in transfers that decreased the balance due to Beekman. These amounts were reflected through 367 transfers between Beekman and Dynamo; 212 of those were repayments or adjustments that decreased the balance owed to Beekman. One of the transactions that increased the total amount due was interest of $25,607,340.[6]

For 2007 Mr. Moses determined that the total outstanding balance due was $176,194,052 resulting from $188,094,578 of transfers that increased the balance due to Beekman and $513,734,767 of transfers that decreased the balance due to Beekman. These amounts were reflected through 2,718 transfers between Beekman and Dynamo; 2,545 of those were repayments or adjustments that decreased the balance owed to Beekman. One of the transactions that increased the total amount due was interest of $17,220,493.

_____

[6]Although the description says "interest amount paid", Mr. Moses testified that the interest amount accrued to the loan balance and was paid as part of the satisfaction of the loans.

**[\*17]** Mr. Moses determined that the advances were entirely repaid including interest in 2011. The Commissioner did not offer any expert who contradicted Mr. Moses.

### C. Commercial Lending Practices

At trial the Commissioner called Filmore Enger to explain whether a commercial lender would have entered into loans like those between Dynamo and Beekman. Mr. Enger has over 25 years of experience in the commercial lending and banking industry.

A commercial lender is typically a commercial bank, but a commercial lender can also be a nonregulated financial company. Mr. Enger explained that the basic elements required for a commercial loan are a stated principal amount and interest rate, documentation that requires principal and interest to be repaid, and a credit agreement that specifies the terms and conditions of such repayment. He believed that no reasonable commercial lender would have given Dynamo loans like those from Beekman on July 1, 2005, and December 11, 2006, without credit guaranties or collateral, credit analyses, loan documents, stated interest payments, or fixed maturity dates.

**[*18]** D.     Capital Adequacy

At trial petitioners called Israel Shaked and William Chambers to testify to Dynamo's ability to repay the advances.  The Commissioner called Christopher Lucas as an expert to explain whether Kolter Communities and Kolter Capital could have obtained the advances from third-party lenders.

1.     Professor Shaked

Professor Shaked is a professor of finance and economics with almost 40 years of experience teaching doctoral, graduate, and undergraduate courses on finance and economics.  He has extensive valuation and financial consulting experience and has written multiple books on these topics.

He conducted financial analyses of Dynamo for the years in issue to analyze the creditworthiness from the viewpoint of a third-party lender.  He conducted forward-looking economic analyses based on economic trends and Dynamo's financial statements to examine Dynamo's short-term and long-term ability to repay, the degree to which the fair market value of Dynamo's assets exceeded the value of its debts, and Dynamo's capital adequacy.

On the basis of his review, Professor Shaked determined that Dynamo's financial position would have been viewed favorably by a third-party lender.  He concluded that Dynamo had the ability to repay its debts in both the short term and

**[*19]** the long term. He also calculated that Dynamo's assets exceeded the value of its debt, including the advances from Beekman, by at least $124 million and as much as $292 million. Finally, he determined that Dynamo was adequately capitalized on the basis of "net debt", which requires subtracting cash and marketable securities from debt of the business enterprise. He explained that portfolios could be easily liquidated. He concluded that Dynamo's liquid assets exceeded its debt throughout the years at issue.

### 2. Dr. Chambers

Dr. Chambers is a professor of Finance with over 30 years of credit rating experience. For over 10 years Dr. Chambers has been teaching graduate and undergraduate courses in portfolio management, financial markets, and corporate finance. Before becoming a professor, Dr. Chambers spent two decades in the credit rating division of Standard & Poor's and was involved in developing credit rating criteria and procedures.

Dr. Chambers conducted a credit analysis of Dynamo for the years in issue to determine what credit rating might have been assigned to it. He reviewed the lockup periods for the hedge fund and determined that all but one expired on January 1, 2006. He determined that Dynamo's credit rating would never have

[*20] been below a "B", which indicates that it could have obtained loans on substantially similar economic terms as the advances from Beekman.

### 3. Mr. Lucas

Mr. Lucas is a financial analyst with 20 years of business valuation experience. He analyzed the debt capacity of Kolter Communities and Kolter Capital using three models: a credit metric analysis, comparing the Kolter entities to peer entities; a KMV-Merton analysis, analyzing the likelihood of default; and a cashflow stress test, analyzing the ability to refinance. He chose those specific models at the request of counsel to the Commissioner. On the basis of his models, he concluded that Kolter Communities and Kolter Capital could not have borrowed the amounts of the advances from third-party lenders on comparable terms.

During the second week of trial when Mr. Lucas was called to testify, he submitted an "errata sheet" consisting of 26 pages. In his errata sheet, he admitted to using incorrect information in his analysis. He also admitted, as Professor Shaked illustrated in his rebuttal report, that he understated the revenue forecasting by approximately $575 million in his cashflow analysis and overstated capital expenditures.

[*21] Mr. Lucas was forced to adjust his model. He found that his original model went "haywire" when he ran it with the corrected information and adjusted his formulas to correct for the erroneous results.

When Mr. Lucas ran his new model using more accurate data, he concluded that Kolter Communities had a 75% chance of refinancing at yearend 2005 and that Kolter Capital had a 75% chance of refinancing at yearend 2006 and 2007. Yet in his report and testimony, Mr. Lucas determined that in November 2006 Kolter Communities would not have been able to refinance.

At trial Mr. Lucas explained how the KMV-Merton model operated in determining the probability of default. The KMV-Merton model increases the probability of default over time. The Court questioned Mr. Lucas on the nature of this assumption in his report. The Court asked Mr. Lucas whether over a 10-year period, where each year the company had a 2% chance of default, the company would have a 20% chance of default. Mr. Lucas said that it would. Yet when the Court asked Mr. Lucas: "If I were to flip a coin twice, do I have a 100 percent chance of getting heads in one of those two flips?", Mr. Lucas replied "No" and then added that "I may have misresponded to the additive nature of the probability of default". Mr. Lucas' original report was riddled with errors, and his testimony indicated a lack of familiarity with probabilities, the very subject about which he

[*22] testified.  After corrections for errors, Mr. Lucas' report largely supported petitioners' position that Dynamo would have been able to borrow from a third-party lender.

V.    Asset Transfers

In addition to providing advances to Dynamo, Beekman transferred property to Dynamo.  Beekman transferred the Domani property, the Grande at Mirasol property, the Mainstreet properties, the Verano property, the Jag of Palm Beach property, the Bear's Club property, the Grande Sarasotan property, and the Heathrow Oaks property during the years in issue.  Beekman also transferred the Dynamo Fund and its interest in TOUSA/Kolter, LLC.  At the time of the transfers Beekman and Dynamo did not obtain independent appraisals of the property because the members of the management team believed that, as experts in property valuation and real estate development, they had accurately priced the properties.

A.    The Domani Property

The Domani property was seven acres of real property in North Palm Beach, Florida.  In 2004 Beekman purchased the property for $23,500,000 through a subsidiary, Domani Development, LLC.  Beekman spent an additional $1,056,414 to develop the property.

[*23] In 2005 Dynamo purchased Domani Development, LLC, from Beekman. As payment for the Domani property Dynamo increased the outstanding balance of its debt to Beekman by $12,261,301. Dynamo's plan in March 2006 was to develop the Domani property with luxury condominium units, two-story mansions, guest suites, and boat dockage. After Dynamo purchased the property, it received a loan from Bank of America for $17 million through Domani Development, LLC.

At trial petitioners called Michael Slade to value the Domani property. Mr. Slade is a senior residential appraiser with over 40 years of experience. He holds professional designations in real estate valuation.

In valuing the Domani property retrospectively, Mr. Slade determined that its highest and best use was to be developed into multifamily or mixed-use projects. He used the sales comparison approach, in which the property being valued is compared to similar properties sold in the same timeframe and geographic area.[7] On the basis of this approach, he determined that the fair market value of the Domani property was $23,500,000.

The Commissioner did not call a witness to value the Domani property at trial. The Commissioner believes that the value of the Domani property is

_____

[7]See Butler v. Commissioner, T.C. Memo. 2012-72, 103 T.C.M. (CCH) 1359, 1368 (2012).

[*24] $25,882,872, which the parties agree was Beekman's total investment in the Domani property.

## B. The Grande at Mirasol Property

The Grande at Mirasol property was approximately 42 acres of real property in Palm Beach Gardens, Florida. In 2001 Beekman purchased the Grande at Mirasol property from Taylor Woodrow through a subsidiary, the Grande at Mirasol, Inc. The property consisted of 475 low-rise residential rental units. The purchase agreement contained a provision that could arguably prohibit condominium conversion.

In 2004 Beekman began aggressively pursuing conversion of the complex into condominiums. Beekman attempted to convert the complex quickly because the market for condominiums was brisk. Beekman sent the State of Florida, Bureau of Condominiums a notice of its intent to convert.

In September 2005 Taylor Woodrow and the Grande at Mirasol, Inc., entered into an agreement that amended the restriction on condominium conversion. Under the agreement the Grande at Mirasol, LLC, a Dynamo entity, could convert the Grande at Mirasol property to condominiums on or before December 1, 2006. Upon conversion the Grande at Mirasol, LLC, would pay

[*25] Taylor Woodrow a base compensation of $4,848,618 and bonus compensation when the gross sale proceeds exceeded approximately $136 million.

While still pursuing a conversion, Beekman transferred the Grande at Mirasol property to the Grande at Mirasol, LLC, by merging the Grande at Mirasol, Inc., into the Grande at Mirasol, LLC. Beekman increased the outstanding balance due from Dynamo by $2,684,094 and Dynamo assumed a $38 million liability of Beekman's on November 17, 2005. The following month the Grande at Mirasol, LLC, sent letters to the tenants informing them of the transition to residential condominiums. On January 6, 2006, the Grande at Mirasol, LLC, received approval from the State of Florida to convert to condominiums. By that time, 40% of the tenants had moved, but the condominium market was on the decline.

At trial the Commissioner called Jack Friedman to value the Grande at Mirasol property. Dr. Friedman received his Ph.D. in business administration with a major in real estate and land economics. He is a real estate economist and holds professional designations in real estate valuation, including designations for being an appraiser who has met high standards and contributed to the appraisal industry.

Dr. Friedman prepared a retrospective appraisal of the Grande at Mirasol property to determine its fair market value on November 17, 2005. Dr. Friedman

[*26] determined that its highest and best use was to be converted to condominiums. He determined the fair market value of the Grande at Mirasol property using the sales comparison method. He compared the Grande at Mirasol property to four apartment complexes that were acquired for condominium conversion. Dr. Friedman determined that the fair market value of the property was $121,400,000. He did not account for the cost to convert of $4,848,618.

At trial petitioners called Mr. Slade to value the Grande at Mirasol property. Mr. Slade prepared a retrospective appraisal to determine its fair market value on December 1, 2005. He determined that its highest and best use was to be maintained as a rental apartment complex. Mr. Slade considered condominium conversion but determined that it was restricted. However, he had not seen the agreement between Beekman and the previous land owner under which Dynamo could convert the property to condominiums if it paid compensation. During trial he agreed that if there was no restriction in place on condominium conversions, he would have considered properties that were converted to condominiums in his analysis. On the basis of a sales comparison approach and an income approach, he determined that the fair market value of the Grande at Mirasol property was $56 million.

[*27] C.    The Mainstreet Properties

Between November 2005 and April 2006, Reserve Home Ltd., LP (Reserve Home), transferred a group of properties in Port St. Lucie, Florida, to Mainstreet Village II, LLC, Mainstreet Village III, LLC, and Verano Development II, LLC, all of which are Dynamo entities.  As payment for the Mainstreet properties Beekman and Dynamo recorded a $9,850,000 increase in the outstanding balance due to Beekman from Dynamo.

1.    The Mainstreet Commercial Property

The Mainstreet commercial property consisted of two lots, C and A, and a tract, R.  Reserve Home purchased the Mainstreet commercial property as undeveloped land in 1998 and transferred it to Mainstreet Village II on November 29, 2005.

At trial the Commissioner called Barry Diskin to value the Mainstreet commercial property.  Dr. Diskin has a Ph.D. in land economics and real estate and holds professional designations in real estate valuation.  He has held his designations for over 20 years.

Dr. Diskin prepared a retrospective appraisal of the Mainstreet commercial property to determine its fair market value on November 29, 2005.  He determined that lot C's highest and best use was retail, lot A's highest and best use was

[*28] commercial offices, and tract R's highest and best use was a right-of-way. Using the sales comparison method, Dr. Diskin determined that lot C's fair market value was $3,900,000, lot A's fair market value was $203,000, and tract R did not have value.

On brief, petitioners do not dispute the Commissioner's valuations.

### 2. The Mainstreet Office Building

The Mainstreet Office Building property consists of 2.35 acres of land and a .85-acre drainage easement. This property was developed as a single-tenant, one-story office building. Reserve Home transferred the Mainsteet Office Building property to Mainstreet Village III on April 6, 2006.

At trial petitioners called Mr. Slade to value the Mainstreet Office Building property. Mr. Slade prepared a retrospective appraisal to determine its fair market value on April 6, 2006. He determined that the Mainstreet Office Building property's highest and best use was as an office building. On the basis of a sales comparison approach and an income approach, he determined that the fair market value of the Mainstreet Office Building property was $850,000.

The Commissioner did not offer an expert to value the Mainstreet Office Building property.

**[*29]**      3.      The Mainstreet Vacant Property

The Mainstreet vacant property consists of 2.39 vacant acres. Reserve Home transferred it to Mainstreet Village III on November 29, 2005.

At trial the Commissioner called Dr. Diskin to value the Mainstreet vacant property. Dr. Diskin prepared a retrospective appraisal to determine its fair market value on November 29, 2005. He determined that its highest and best use was as a park or public facility or a donation to the city. Using the sales comparison method, Dr. Diskin determined that the fair market value of the Mainstreet vacant property was $120,000.

Petitioners did not call an expert to value this property.

4.      The G.O. Team Property

The G.O. Team property consists of a total of 62.23 acres that encompass two separate portions: an industrial portion and the remaining portion. The industrial portion is four lots that total 6.68 acres and a 3.40-acre easement. The remaining portion consists of 13 lots on 27.17 acres and a 24.98-acre property that contains a lake.

[*30]               a.        The Industrial Portion

The industrial portion consists of four vacant lots on 6.68 acres and a 3.40-acre easement.  On April 6, 2006, Reserve Home transferred the industrial portion to Mainstreet Village III.

At trial the Commissioner called Dr. Diskin to value the industrial portion.  Dr. Diskin prepared a retrospective appraisal to determine its fair market value on April 6, 2006.  He determined that the industrial portion's highest and best use for the four vacant lots was as small industrial lots and for the easement was as a drainage and utility easement.  Dr. Diskin valued the property using the sales comparison approach.  He selected four comparable properties in St. Lucie County with prices between $4.92 and $10.17 per square foot.  Dr. Diskin determined that the fair market value of the industrial portion was $5 per square foot for a total value of $1,455,000.

At trial petitioners called Mr. Slade to value the industrial portion.  Mr. Slade prepared a retrospective appraisal to determine its fair market value on April 6, 2006.  He determined that the industrial portion's highest and best use was industrial.  Mr. Slade valued the lots using the discount sellout analysis.  In doing so, he selected 10 comparable properties in St. Lucie County and Martin County with prices between $2 and $5.19 per square foot.  He excluded properties with

[*31] higher values from his comparison because he believed that those properties had superior locations. The average per-square-foot price of the remaining comparable properties was $3.85, and the most recent sale was at $3.01 per square foot. He concluded that the estimated price per square foot ranged from $2 to $2.25. He then discounted the total by 16% to account for sales commissions, general administrative costs, developer's profit, real estate taxes, and miscellaneous costs, for a net value of $530,000 for the four lots. He determined that the easement had no value.

### b. The Remaining Portion

The remaining portion consisted of 13 lots and a parcel totaling 24.98 acres. The 24.98-acre parcel had a lake in the middle, leaving only 8.5 acres available to be developed. The zoning classification for the property was industrial. On February 14, 2005, the city council of Port St. Lucie passed Ordinance 04-107, amending the future land use map of these parcels from industrial to low-density residential. On April 6, 2006, Reserve Home transferred the remaining property to Verano Development II, LLC.

At trial each party called an expert to value the remaining portion. The Commissioner called Dr. Diskin. Petitioners called Mr. Slade.

[*32] Dr. Diskin prepared a retrospective appraisal of the remaining portion to determine its fair market value on April 6, 2006. He determined that the remaining portion's highest and best use would be to combine the lots into a low-density residential property with 271 dwelling units clustered on to the buildable portion of the property.

Dr. Diskin valued the property using the sales comparison approach. He selected three comparable properties with adjusted prices per acre of $132,260 to $178,625. Dr. Diskin determined that the value per acre was $140,000 for a total fair market value of $7,900,000.

Mr. Slade calculated the fair market value of the remaining portion in two phases, valuing the 13 remaining lots separately from the 24.98-acre plot with a lake. Mr. Slade treated the 13 smaller lots exactly the same as the industrial portion, using the discount sellout analysis to determine value at the time of the transfer. Mr. Slade determined that the fair market value of the industrial portion ranged from $2 to $2.25 per square foot. He also discounted the value by 16% for sales commissions, general administrative costs, developer's profit, real estate taxes, and miscellaneous costs, for a total value of $1,890,000. At trial, he did not remember seeing the ordinance changing the land to residential, and he did not

[*33] take it into account in his valuation. He believed that if the future land use had changed, he would need to consider the future land use in his valuation.

Mr. Slade treated the 24.98 acres with the lake differently. He again determined that the highest and best use was industrial. Mr. Slade determined the fair market value of the 24.98 acres with the lake with the sales comparison approach. He selected five comparable properties with prices per square foot ranging from $2.66 to $4.04 and determined a fair market value of $3 per square foot, for a total of $1,100,000.

D. The Verano Property

The Verano property was 3,030 acres of real property in Port St. Lucie, Florida. Beekman purchased all of the Verano property by the summer of 2003. The Verano property was largely vacant land. Beekman held the Verano property indirectly through its ownership of Reserve Home. As of February 2006, Beekman's total cost for the Verano property was approximately $49,477,298.

On February 28, 2006, Reserve Home transferred the Verano property to Verano Development, LLC, and a small tract of the Verano property to PSL Commercial Holdings II, LLC, both of which were indirect wholly owned subsidiaries of Dynamo. Verano Development, LLC, paid $49,477,298 for the Verano property. Dynamo planned to build 6,300 residential units on the

[*34] property, including a nine-hole golf course. Shortly after purchasing the land, Verano Development, LLC, was approved for a $90 million loan from Suntrust, with the option to increase the loan to $150 million, secured by the Verano property.

At trial the Commissioner called Jack Friedman to value the Verano property. Dr. Friedman prepared a retrospective appraisal to determine its fair market value on February 28, 2006. Dr. Friedman determined that its highest and best use was to develop it into a master-planned community. He determined the fair market value of the Verano property using the sales comparison method. He compared the Verano property to three properties, either slated for residential development or developed, located in Port St. Lucie and sold under the same market conditions.

One property included in the comparison, the Centex property, was within one mile of the Verano property and was a large master-planned community consisting of 2,067 acres. The Centex property sold for $110,000,000. At the time of the sale, like the Verano property, the Centex property had not been developed. In determining the fair market value of the Verano property, Dr. Friedman gave the Centex property 50% weight and determined that the Verano property's value was $140,000,000.

[*35] Petitioners called Mr. Slade to value the Verano property. Mr. Slade prepared a retrospective appraisal to determine its fair market value on February 28, 2006. He determined that the Verano property's highest and best use was as a future mixed use development. Mr. Slade also used the sales comparison approach and included the Centex property; however, he believed the value of the Verano property should be less than that of the Centex property because the Centex property had superior road access. Mr. Slade determined that the fair market value was $101,500,000.

### E.    Other Transfers

In January 2005 Beekman made a $17,500,000 partnership contribution to TOUSA/Kolter, LLC, and received a 50% interest. A portion of that contribution, $3 million, was subsequently credited back to Beekman thereby reducing its contribution to $14,500,000. In 2005 TOUSA/Kolter, LLC, purchased the Monterra property. Beekman transferred its TOUSA/Kolter, LLC, interest to Dynamo in early 2005. Dynamo reported a $14,500,000 increase to the outstanding balance due to Beekman.

On December 31, 2005, Beekman held the Dynamo Fund, with a fair market value of $228,234,808. During the first half of 2006 Beekman transferred all of the assets in the Dynamo Fund to Dynamo. Between January 1 and June 29, 2006,

[*36] Dynamo paid a total of $198,025,037 for the Dynamo Fund assets. The payments were recorded as increases in the outstanding balance due to Beekman.

During the years in issue Beekman also sold to Dynamo the Jag of Palm Beach property, the Bear's Club property, the Grande Sarasotan property, and the Heathrow Oaks property for $2,444,252, $1,500,000, $14,941,911, and $12,762,189, respectively. Neither party offered any valuation evidence as to these properties at trial.

## VI.    U.S. Real Property Holding Corporation

At trial petitioners called Richard Preston to calculate Beekman's percentage of U.S. real property interests as a share of its total real property interest both inside and outside the United States and other assets which are used or held for use in a trade or business for purposes of determining whether Beekman is a U.S. real property holding corporation as defined by section 897(c)(2).[8] Mr. Preston has 46 years of experience as a public accountant.

Mr. Preston analyzed the book value of Beekman's U.S. real property and the book value of its total real property and business assets. He excluded from his real property calculation any U.S. real property that was held primarily for sale in

---

[8]All section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*37] the ordinary course of business. He determined that from June 30, 2001 to 2007, Beekman's share of U.S. real property as a percentage of its total real property and business assets never exceeded 11.65%.

The Commissioner did not call an expert. Instead, the Commissioner calculated the fair market value of Beekman's U.S. real property holding interests and the fair market value of Beekman's business assets, including real estate, using information provided on Beekman Vista's Forms 1120, U.S. Corporation Income Tax Return. The Commissioner took the book value reported on the return and added back the estimated amount of income Beekman earned from disposal of the properties in later years. The Commissioner determined that Beekman's percentage of U.S. real property as a share of its total real property and business assets never fell below 78%.

The Commissioner also prepared the calculation using the same book values as Mr. Preston; however, the Commissioner did not exclude U.S. real property held primarily for sale in the ordinary course of business. Using the alternative book values, the Commissioner determined that the share of U.S. real property never fell below 42.74%.

**[*38]** VII.   Reporting and Examinations

Beekman Vista and Dynamo Holdings file different returns and have different tax year ending dates.  For each of the years in issue Beekman Vista filed Form 1120 and had a fiscal tax year ending June 30.  Beekman Vista also filed Form 1042, Annual Withholding Tax Return for U.S. Source Income of Foreign Persons, to report tax withheld on payments to foreign persons.  Dynamo Holdings filed for each year Form 1065, U.S. Return of Partnership Income, and had a calendar tax year.  The management team did not research how to record the transfers or seek advice on how to report the transfers for tax purposes.

A.   Beekman Vista

Beekman Vista filed a Form 1120 for each of its tax years ending June 30, 2006 through 2008.  KPMG LLP, based in Canada, prepared and signed the returns.  Each year Beekman Vista filed as an accrual method taxpayer.

On its 2005 Form 1120 Beekman Vista reported current assets of $521,452,519 due from advances and no interest income from its advances to affiliates.  On its 2006 Form 1120 Beekman Vista reported current assets of $518,293,045 due from advances and interest income of $25,607,340 received from its advances to affiliates.  On its 2007 Form 1120 Beekman Vista reported current assets of $445,102,107 due from advances and interest income of

[*39] $17,220,492 from its advances to affiliates. Beekman Vista did not file Form 1042 for 2005 or 2006 or make any deposits with respect to withholding taxes before 2009.

During 2007 through 2009 the Commissioner examined Beekman Vista's Forms 1120 for the tax years ending June 30, 2004 through 2008. During that examination the revenue agent determined that Beekman Vista owed withholding taxes for 2005 and 2006 on transfers unrelated to the issues in these cases. In 2009 the revenue agent prepared Forms 1042 for Beekman Vista for 2005 and 2006. Beekman Vista signed and filed the Form 1042 for 2005 on February 17, 2009, and the Form 1042 for 2006 on September 30, 2009. Beekman paid the amounts shown on those returns. After the returns were filed, the revenue agent concluded that no penalties would be proposed because the Beekman Vista representatives provided a statement of reasonable cause.

B.    Dynamo Holdings

Dynamo Holdings filed Forms 1065 for 2005, 2006, and 2007. Ernst & Young LLP prepared and signed the Dynamo Holdings Forms 1065. Dynamo Holdings reported that it was an accrual basis taxpayer.

[*40] Dynamo Holdings filed its short-year 2005 Form 1065 reporting liabilities of $257,949,054 for intercompany advances and no interest expense paid to Beekman.

Dynamo Holdings filed 2006 Form 1065 and reported advances as a liability and interest expenses. It reported yearend other liabilities of $635,337,482 for intercompany advances, interest expenses not reported elsewhere of $18,192,267, and investment interest expenses of $19,656,535. It also reported that it had no nonrecourse liabilities. Dynamo Holdings included a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for Dynamo GP, reporting $878,187,986 of recourse liabilities, and Schedules K-1 for the Christine Dynasty Trust and Julien Dynasty Trust reporting no recourse liabilities.

On its filed Form 1065 for 2007 Dynamo Holdings did not report advances as a liability but did report interest expenses. It reported interest expenses not reported elsewhere of $17,309,252 and no nonrecourse liabilities. Dynamo Holdings included a Schedule K-1 for Dynamo GP, reporting $477,313,741 of recourse liabilities and Schedules K-1 for the Christine Dynasty Trust and Julien Dynasty Trust reporting no recourse liabilities.

**[\*41]** VIII.   FPAA and Notice of Deficiency

In June 2008 the Commissioner began an examination of Dynamo Holdings' returns.  After the examinations of Beekman Vista's and Dynamo Holdings' returns, the Commissioner issued a notice of final partnership administrative adjustment (FPAA) with respect to Dynamo Holdings and a notice of deficiency to Beekman Vista.

On December 28, 2010, the Commissioner timely issued an FPAA with respect to Dynamo Holdings for 2005, 2006, and 2007.  The Commissioner made several adjustments in the FPAA, including adjusting interest expenses by $25,607,340 and $16,921,256 for 2006 and 2007, respectively.  The Commissioner also adjusted forgiveness of indebtedness income and distributions to partners.  The Commissioner determined a section 6662(a) accuracy-related penalty for each year.

On February 1, 2012, the Commissioner issued Beekman Vista a timely notice of deficiency for calendar years 2005 and 2006.  The Commissioner determined that Beekman Vista made U.S. source distributions to a Canadian corporation subject to withholding tax of $561 million and $506 million and was liable for a section 6651(a)(1) addition to tax and a section 6656(a) penalty for each year.  The Commissioner made the following determinations:

[*42]

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6656(a) |
|------|-----------|--------------------------------|----------------------|
| 2005 | $56,109,757 | $14,027,439 | $5,610,976 |
| 2006 | 50,623,698 | 12,655,924 | 5,062,370 |

IX.    Tax Court Proceedings

Dynamo GP, the tax matters partner of Dynamo Holdings, and Beekman

Vista timely petitioned this Court for review on February 1, 2011, and April 4,

2012, respectively.  At the time the petitions were filed, Dynamo Holdings' and

Beekman Vista's principal place of business was in Florida.  The Court

consolidated these cases.

Both parties conducted extensive pretrial discovery.  The parties first

engaged in informal discovery.  The Commissioner requested all documents

relating to transfers of value between Dynamo and Beekman.  Two years later, the

parties involved the Court in their pursuit of formal discovery.  We issued

Dynamo Holdings Ltd. P'ship v. Commissioner,[9] which allowed Dynamo to

respond to the Commissioner's request using predictive coding.  The parties'

discovery battles continued.  Dynamo submitted 10 requests for admissions and a

motion to compel production of documents.  Shortly thereafter, the Commissioner

[9]143 T.C. 183 (2014).

**[*43]** filed two motions to compel production of documents and six motions to compel the taking of depositions.[10]

Six months before trial the Commissioner filed a motion to amend his answer to Beekman Vista's petition to increase the deficiencies, additions to tax, and penalties. The Commissioner included a list of 52 initial transfers included in the calculations in the notice of deficiency and a revised list of 146 transfers that increased the deficiencies. The Commissioner increased the amounts of the transfers from the amounts recorded on the books for the following properties: the Grande at Mirasol property, the Mainstreet properties, the Jag of Palm Beach property, the Bear's Club property, the Domani property, the Grande Sarasotan property, and the Heathrow Oaks property. The Commissioner also increased the amounts of the transfers from the amounts recorded on the books with respect to the TOUSA/Kolter, LLC interest and the Dynamo Fund. We granted the motion. The Commissioner's amended determinations are as follows:

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6656(a) |
|------|-----------|--------------------------------|----------------------|
| 2005 | $57,906,514 | $14,476,628 | $5,790,651 |
| 2006 | 75,944,517 | 18,986,129 | 7,594,452 |

[10]We note that the Commissioner did not file a motion to compel the taking of a deposition of Mrs. Moog.

**[*44]** The parties have resolved or conceded various items.

## OPINION

The principal issues in these cases are 1) whether transfers from Beekman to Dynamo were gifts or loans and 2) whether there were transfers of property from Beekman to Dynamo at less than fair market value. To the extent the Commissioner prevails, his prevailing would give rise to constructive distributions up the Beekman chain of entities, and those distributions could be subject to withholding taxes. As to the first issue, we must first determine whether the advances were bona fide debt. As to the second issue, we must determine whether property was transferred at fair market value. If we find that the transfers were not bona fide debt or that property was transferred at less than fair market value, then we must determine whether there were constructive distributions. If there were, then we must determine whether Beekman was required to withhold taxes.

## I.    Burden of Proof

In general, the Commissioner's determinations in a notice of deficiency and an FPAA are presumed correct, and taxpayers bear the burden of proving otherwise.[11]

---

[11]Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

**[*45]** The Commissioner bears the burden of proof, however, on any new matter, increases in deficiency, or affirmative defenses pleaded in his answer.[12] The Commissioner filed an amendment to answer asserting increased deficiencies as well as penalties and additions to tax against Beekman. The Commissioner has the burden on these increases.[13]

The Commissioner contends, however, that he bears the burden only on the amounts of the deficiencies increased over what was included in the FPAA and the notice of deficiency. He argues that, after his concessions for 2005, Beekman's total deficiency for that year is less than the amount determined in the notice of deficiency so that he does not bear any burden with respect to 2005. We disagree.

A new theory or reason that is presented to sustain a deficiency is treated as a new matter when it increases the amount of the deficiency or requires the presentation of different evidence.[14] The issues raised in the amendment to answer require the presentation of different evidence. The Commissioner issued a notice of deficiency that determined that Beekman made distributions to a Canadian

---

[12]Rule 142(a); <u>Shea v. Commissioner</u>, 112 T.C. 183, 190-191 n.10 (1999).

[13]Rule 142(a); <u>Shea v. Commissioner</u>, 112 T.C. at 191.

[14]<u>See</u> <u>Shea v. Commissioner</u>, 112 T.C. at 191-192; <u>Wayne Bolt & Nut Co., v. Commissioner</u>, 93 T.C. 500, 507-508 (1989).

**[*46]** corporation and was liable for withholding taxes on those distributions.

Beekman bears the burden of proving that the Commissioner's determinations in

the notice of deficiency were incorrect.[15]  However, the Commissioner then filed

an amendment to answer in which he increased the amounts of the distributions to

the Canadian corporation by increasing the values of the properties transferred

from Beekman to Dynamo.  This requires the presentation of different evidence,

including reports of valuation experts.  Accordingly, we find that the

Commissioner bears the burden of proof on the increased values of property that

were asserted in the amendment to answer.

In the amendment to answer the Commissioner also increased the additions

to tax under section 6651(a)(1) and the penalties under section 6656(a).  The

Commissioner bears the burden of proof on any increase in the amounts of

penalties over what was originally determined in the notice of deficiency.[16]  For

penalties under section 6656(a) the burden of proof includes written supervisory

approval as required by section 6751(b).[17]

---

[15]See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

[16]Rader v. Commissioner, 143 T.C. 376, 389 (2014), aff'd in part, 616 F. App'x 391 (10th Cir. 2015).

[17]Graev v. Commissioner, 149 T.C. __, __ (slip op. at 14) (Dec. 20, 2017),

(continued...)

[*47] In limited situations the burden may shift to the Commissioner under section 7491(a). Petitioners do not argue that the burden should shift, and we find that the facts do not suggest that it should. Accordingly, the burden does not shift under section 7491(a) on the remaining items.

## II.     Debt vs. Gift

The Commissioner argues that the advances were not loans from Beekman to Dynamo but were gifts from Mrs. Moog to the Dynamo trusts in a 60/40 split. The question of whether a taxpayer has entered into a bona fide creditor-debtor relationship pervades Federal tax litigation.[18] The parties must have actually intended to establish a debtor-creditor relationship for a transaction to be a bona fide loan.[19] To find a bona fide creditor-debtor relationship, we must determine that at the time the advances were made there was "an unconditional obligation on

---

[17](...continued)
supplementing 147 T.C. 460 (2016).

[18]See, e.g., Ellinger v. United States, 470 F.3d 1325,1333-1334 (11th Cir. 2006); Calloway v. Commissioner, 135 T.C. 26, 36-37 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012).

[19]Calloway v. Commissioner, 135 T.C. at 37; see also Ellinger, 470 F.3d. at 1333.

**[\*48]** the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment."[20]

We apply special scrutiny to intrafamily transfers and transactions between entities in the same corporate family or with shared ownership.[21] Transfers between family members are presumed to be gifts.[22] This presumption can be rebutted by "an affirmative showing that there existed a real expectation of repayment and intent to enforce the collection of the indebtedness."[23] When analyzing transfers between related parties, it is useful to compare the transactions at issue to arm's-length transactions and normal business practices.[24] However,

---

[20]Haag v. Commissioner, 88 T.C. 604, 616 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988).

[21]Kean v. Commissioner, 91 T.C. 575 (1988); Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578 (1968); Vinikoor v. Commissioner, T.C. Memo. 1998-152, 75 T.C.M. (CCH) 2185 (1998).

[22]Perry v. Commissioner, 92 T.C. 470, 481 (1989), aff'd without published opinion, 912 F.2d 1466 (5th Cir. 1990); Barr v. Commissioner, T.C. Memo. 1999-40, 77 T.C.M. (CCH) 1370, 1372 (1999); Vinikoor v. Commissioner, 75 T.C.M. (CCH) at 2187.

[23]Vinikoor v. Commissioner, 75 T.C.M. at 2187.

[24]Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980).

**[\*49]** we must also be mindful of the business realities of related parties.[25]  For

example, we have held that security and other creditor protections are less

important in a related-party context.[26]

The Court of Appeals for the Eleventh Circuit, to which these consolidated

cases could be appealed, has developed a 13-part test to determine whether an

advance is debt or equity.[27]  While this is similar to our bona fide debt analysis,

there are some inconsistencies.  The Court of Appeals' 13-factor debt-versus-

equity test asks the Court to look to the totality of all the facts and circumstances

and specifically directs the Court to consider the following:

(1)     the names given to certificates evidencing the indebtedness;
(2)     the presence or absence of a fixed maturity date;
(3)     the source of payments;
(4)     the right to enforce payment of principal and interest;
(5)     participation in management flowing as a result;
(6)     the status of the contribution in relation to regular corporate creditors;
(7)     the intent of the parties;
(8)     "thin" or adequate capitalization;

---

[25]Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377-378 (1973); NA Gen. P'ship & Subs. v. Commissioner, T.C. Memo. 2012-172, 103 T.C.M. (CCH) 1916, 1920 (2012); see also Malone & Hyde, Inc. v. Commissioner, 49 T.C. at 578.

[26]NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) at 1920-1921.

[27]Ellinger, 470 F.3d at 1333-1334.

[*50] (9)    identity of interest between creditor and stockholder;

(10)   source of interest payments;

(11)   the ability of the corporation to obtain loans from outside lending institutions;

(12)   the extent to which the advance was used to acquire capital assets; and

(13)   the failure of the debtor to repay on the due date or to seek a postponement.[28]

But this is not a debt-versus-equity case. The Commissioner argues that the transfers were gifts, not equity. As a result, our inquiry is not focused on weighing debt versus equity, but rather on considering whether there is a bona fide debt. While the debt-versus-equity test adopted by the Court of Appeals offers some guidance, it is not directly on point.

In Jones v. Commissioner, we used a long-standing nine-factor facts and circumstances test to determine whether two parties entered into a valid debtor-creditor relationship.[29] We evaluated all the pertinent facts and circumstances of the case, including whether:

(1) There was a promissory note or other evidence of indebtedness, (2) interest was charged, (3) there was security or collateral, (4) there was a fixed maturity date, (5) a demand for repayment was made, (6) any actual repayment was made, (7) the transferee had the ability to repay, (8) any records maintained by the transferor and/or the

---

[28]Ellinger, 470 F.3d at 1333-1334.

[29]Jones v. Commissioner, T.C. Memo. 1997-400, 74 T.C.M. (CCH) 473, 482 (1997), aff'd without published opinion, 177 F.3d 983 (11th Cir. 1999).

**[\*51]** transferee reflected the transaction as a loan, and (9) the manner in which the transaction was reported for Federal tax is consistent with a loan. * * *

Our opinion in <u>Jones</u> was affirmed without a published opinion. Because the Court of Appeals has adopted only a debt-versus-equity test rather than a bona fide debt test like the one employed in <u>Jones</u>, and because the Court of Appeals affirmed our holding in <u>Jones</u> and has not adopted a contravening ruling, we continue to rely on our nine-factor analysis.[30]

In applying this multifactor test we do not merely count the factors, and not all factors are equal; instead, we analyze the pertinent facts to determine whether a bona fide debtor-creditor relationship was established.[31] These factors fall roughly into two categories: formal indicia of debt and economic indicia of debt.

Petitioners allege that Dynamo and Beekman had the intent to repay and be repaid as demonstrated by their subjective declarations of their intent. Conversely, the Commissioner argues that we should draw an adverse inference from Mrs. Moog's failure to testify at trial and infer that Dynamo and Beekman did not intend to repay and be repaid. We disagree with both parties.

---

[30]<u>Golsen v. Commissioner</u>, 54 T.C. 742 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971).

[31]<u>See</u> <u>Ellinger</u>, 470 F.3d at 1334; <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. at 493-494.

[*52] We apply a special scrutiny to transactions between companies with shared ownership and intrafamily transfers, and we presume that transfers between family members are gifts.[32]  Here, transfers between Beekman and Dynamo were transfers between companies with both shared ownership and intrafamily transfers.

Beekman and Dynamo had shared ownership and control.  Both Dynamo and Beekman were owned in part by trusts for which Christine, Mr. Julien and their families were beneficiaries.  Transfers between the two structures were transfers between companies with shared ownership.

Transfers between Beekman and Dynamo were ultimately intrafamily transfers.  When Beekman made transfers to Dynamo, value was being transferred from one family of companies, the majority of which were held by trusts for which Delia Moog is a beneficiary, Delia Moog Family Trust and Delia Moog Family Trust #2, to another family of companies, the majority of which were held by trusts for which her daughter and nephew and their families were beneficiaries.  While Christine and Mr. Julien were also beneficiaries of some of the trusts which owned Beekman, the transfers from Beekman to Dynamo reduced Delia Moog's

---

[32]Perry v. Commissioner, 92 T.C. at 481; Kean v. Commissioner, 91 T.C. at 595; Vinikoor v. Commissioner, 75 T.C.M. (CCH) at 2187.

[*53] beneficial interest in the underlying properties in favor of her daughter, her nephew, and their families.

Given the nature of these transfers, we treat them with special scrutiny and determine whether the advances are gifts or loans for Federal tax purposes on the basis of the totality of the circumstances.[33]  On that basis we find that the advances were loans.

## A.     Formal Indicia of Debt

Dynamo and Beekman satisfied some but not all of the formal indicia of debt.  We agree with the Commissioner that at the time the advances were made there was no contemporaneous promissory note identifying all the terms of the agreement, there was no collateral set aside to ensure repayment, there was no invoice or demand made by Beekman, and there was no fixed maturity date or intent to force Dynamo into bankruptcy if required to ensure repayment.  However, there are many meaningful indicia of debt.  Dynamo and Beekman maintained records that reflected advances as debt in their general ledgers, and they executed promissory notes.

---

[33]See Estate of Mixon, 464 F.2d at 402.

**[*54]**      1.      <u>General Ledgers</u>

We find that Dynamo's and Beekman's general ledgers consistently reflected the advances as debt. They had a well-established practice of recording and repaying advances. The advances to Dynamo and its subsidiaries were booked as amounts due to Beekman. Likewise, advances from Beekman were recorded as amounts due from Dynamo. Although Dynamo made occasional errors in reporting, those incorrect entries could not be erased and were required to be corrected through reversing entries. These corrections were reflected in the records and give credibility to their reporting.

Moreover, Mr. Moses, the only forensic expert in these cases, detailed each entry and calculated the amounts of advances and repayments. We may accept or reject expert testimony when in our best judgment, on the basis of the record, it is appropriate to do so.[34] On the basis of the record, it is appropriate to accept Mr. Moses' testimony because we find his process of determining the amount of advances and repayments credible.

In his posttrial brief the Commissioner challenges Mr. Moses' report and posits that Beekman simply offset ledger entries rather than have Dynamo pay its

---

[34]Fed. R. Evid. 702; <u>Parker v. Commissioner</u>, 86 T.C. 547, 561 (1986); <u>see also</u> <u>Sherrer v. Commissioner,</u> T.C. Memo. 1999-122, 77 T.C.M. (CCH) 1795, 1800-1801 (1999), <u>aff'd</u>, 5 F. App'x 719 (9th Cir. 2001).

**[*55]** debts. We find, however, that Dynamo repaid its debts to Beekman in part by providing management services to Beekman. Beekman paid for those management services by reducing the amounts due from Dynamo. Those reductions had the economic effect of payments and should be respected.

The Commissioner argues for the first time on brief that we should impose an adverse inference because petitioners did not produce all of Beekman's and Dynamo's partners' records. We may draw an adverse inference when a party alleges a fact but fails to introduce evidence within his possession which, if true, would be favorable to him.[35] However, we will not speculate on what such documents would show when the party requesting the inference could have used discovery tools but did not.[36] The Commissioner never requested the documents from Dynamo's partners. Accordingly, we will not draw an adverse inference.

Moreover, we will not draw an adverse inference against Dynamo and Beekman for not producing a portion of Beekman's general ledgers. Mr. Moses testified that he reviewed the general ledgers for Beekman to confirm his findings

---

[35]Callahan v. Schultz, 783 F.2d 1543, 1545 (11th Cir. 1986); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).

[36]Stevenson v. Commissioner, T.C. Memo. 1986-207, 51 T.C.M (CCH) 1050, 1060 n.13 (1986).

**[\*56]** and that he had confirmed specific transactions with Beekman's general ledger. On the basis of Dynamo's and Beekman's books and records, he determined that advances were repaid. Moreover, during discovery the Commissioner found that he did not have Beekman's general ledgers. He did not file a motion to compel for Beekman's general ledgers then; he cannot request an adverse inference now.[37]

2.    Demand Note

We find that Beekman and Dynamo executed a promissory note as part of the restructuring transactions. This note was executed no later than February 2008. The note had the customary loan terms, including the amount of the loan, interest rate accrual, and demand terms. Although the promissory notes were not executed contemporaneously with all of the advances, we have previously found that after-the-fact consolidation of advances and execution of promissory notes can indicate that the advances were debt.[38]

---

[37]See Eriksen v. Commissioner, T.C. Memo. 2012-194, 104 T.C.M. (CCH) 46, 53 n.13 (2012) (denying an adverse inference when the requesting party failed to include trial subpoenas and did not specify the scope of the documents requested).

[38]Swain v. Commissioner, T.C. Memo 1981-716, 43 T.C.M. (CCH) 121, 129 (1981).

[*57] Moreover, we are persuaded by the fact that the notes were created as a part of the restructuring transactions wherein multiple documents identifying the advances as loans were created. The Commissioner asks us to follow the line of reasoning in cases where courts have held that a promissory note created after the commencement of an examination should count against a finding of debt.[39] We find that an examination did not cause the execution of the notes in these cases. Moreover, the notes were created before Dynamo's 2007 Form 1065 was due. We find that the notes were created as part of a greater restructuring effort.

The Commissioner argues that the notes are unenforceable and that the unenforceability shows that Dynamo's and Beekman's objective intent was not to enforce repayment or make payment. The Commissioner argues that the notes are unenforceable because Dynamo and Beekman failed to pay stamp tax, and under Florida statutes, failure to pay stamp tax renders the note unenforceable.[40] However, the weight of the evidence shows that the parties executed the notes to

---

[39]See Williams v. Commissioner, 627 F.2d 1032, 1035 (1980), aff'g T.C. Memo. 1978-306; Baird v. Commissioner, 25 T.C. 387, 394-395 (1955); Georgiou v. Commissioner, T.C. Memo. 1995-546, 70 T.C.M. (CCH) 1341, 1351 (1995).

[40]Fla. Stat. sec. 201.08(1)(b) (2006) ("The * * * instrument shall not be enforceable in any court of this state as to any such advance unless and until the tax due thereon upon each advance that may have been made thereunder has been paid.").

[*58] memorialize the restructuring transactions, and in doing so, they also memorialized their longstanding practice of advancing and repaying loans.

The demand notes, as is customary with demand notes, did not have a fixed maturity date. While the Court of Appeals for the Eleventh Circuit has found a lack of fixed maturity date "highly significant" in a debt versus equity analysis, here Beekman and Dynamo simply memorialized their longstanding practice of advancing and repaying loans.[41] In cases where that Court of Appeals has found a lack of fixed maturity date troubling, the parties also failed to repay the debt or pay interest on the notes and the "creditors" failed to show that they truly intended to have the debt repaid.[42] Here, the parties intended to repay the principal as well as interest on the loans and in fact did so. Consequently, the lack of fixed maturity dates does not create the same concern.

We have previously stated that notes in a "closeknit family of corporate cousins are not as necessary to insure repayment as may be the case between unrelated entities."[43] Dynamo and Beekman have notes even though the loans are

---

[41]Ellinger, 470 F.3d at 1334.

[42]See, e.g., Ellinger, 470 F.3d at 1334; Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), aff'g T.C. Memo 1982-314.

[43]Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 377-378 (quoting Am.

(continued...)

[*59] between related parties.  We find that on the basis of these facts, this factor is either neutral or weighs in favor of debt.

However, related-party demand notes are afforded little weight.[44]  Thus, although we find the demand notes may weigh in favor of debt, we give the notes little weight.

We are not troubled by any shortcomings in Dynamo's and Beekman's formal indicia of debt.  They must be taken into account in the context of the business realities of the transaction.  We would be surprised if Mr. Julien wrote himself an invoice, demanded repayment, or required a credit check or audited financial statements before making an advance.  The management of these companies was the same, and they had full knowledge of and access to all financial information.  Moreover, we have consistently held that these formal indicia of debt are little more than declarations of intent without accompanying objective economic indicia of debt.[45]

---

[43](...continued)
Processing & Sales Co. v. United States, 371 F.2d 842, 857 (Ct. Cl. 1967)); see also Estate of Mixon, 464 F.2d at 403.

[44]Williams v. Commissioner, T.C. Memo. 1978-306, 37 T.C.M. (CCH) 1270, 1277-1278 (1978).

[45]Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974);

(continued...)

**[*60]** B.  Economic Indicia of Debt

In ascertaining the economic realities of the transaction, it is helpful to measure the transfer against the economic realities of the marketplace to determine whether a third party lender would have extended the loan.[46]  Dynamo and Beekman satisfy all the objective economic indicia of debt.  Beekman charged and Dynamo accrued interest on the advances in 2006 and 2007.  Beekman reported and paid tax on that interest income.  Dynamo reported and deducted that interest expense.  Dynamo repaid some of the advances before any examination began.  At all times, Dynamo had the ability to repay the loans.  Importantly, Dynamo could have received loans on substantially similar terms.  And Dynamo did receive sizable loans from third parties.

1.  Interest and Tax Reporting

We find that Dynamo accrued interest with respect to the advances, and Dynamo Holdings and Beekman Vista reported the interest on their Forms 1065 and 1120.  Tax reporting can be a formal indicia of debt or an economic indicia of

_____

[45](...continued)
Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Sensenig v. Commissioner, T.C. Memo. 2017-1, at *24-*26, aff'd, __ F. App'x __, 2018 WL 508567 (3d Cir. Jan. 23, 2018).

[46]Sensenig v. Commissioner, at *26-*27.

**[*61]** debt.  Where tax reporting has no economic consequences, it is a purely formal indicia of debt.  Where tax reporting has economic consequences, as where reporting interest income gives rise to taxable income, we consider it to be an economic indicia of debt.

Dynamo accrued interest on the advances to Beekman of $25,607,340 and $17,220,493 in 2006 and 2007, respectively.  These interest expenses were indicated by one book entry at the end of each year.  Interest accrued and was added to the outstanding balance and was paid as the outstanding balance was repaid.  Although the interest rate was not provided, it is clear that interest was applied.  Moreover, we are not troubled by the lack of 2005 interest accruals.  The advances were booked at the end of 2005, so interest would not have accrued for 2005.

Beekman Vista reported interest income and Dynamo Holdings reported interest expense.  Beekman Vista reported $25,607,340 and $17,220,493 on its 2006 Form 1120 and 2007 Form 1120, respectively.  Dynamo Holdings reported interest expenses of  $18,192,267 and $19,656,353 on its 2006 Form 1065 and $17,309,252 on its 2007 Form 1065.  Both the fact that Dynamo accrued and paid interest on its advances from Beekman and the fact that both Beekman Vista and

**[*62]** Dynamo Holdings reported the interest payments for tax purposes point toward debt.

### 2. Repayments

We find that Dynamo made repayments to reduce the outstanding balance each year without regard to any examination. Repayments, especially repayments before the Commissioner has begun an examination, indicate debt.[47] Dynamo repaid Beekman with funds from capital contributions from the trusts, and with wire transfers. Dynamo also reduced the outstanding balance due by providing management services and by making payments on debts that Beekman owed to third parties.

In Dynamo's first year of operations, Dynamo decreased the outstanding balance by $137,531,626. In its second year of operations, Dynamo decreased the outstanding balance by $986,943,581. Although the outstanding balance increased in 2006, Dynamo's 2006 payments completely repaid the balance from 2005. During the year ending December 31, 2007, Dynamo decreased the outstanding balance by $513,734,767. This amount left the outstanding balance at

---

[47]Miele v. Commissioner, 56 T.C. 556, 568 n.5 (1971), aff'd without published opinion, 474 F.2d 1338 (3d Cir. 1973); Epps v. Commissioner, T.C. Memo. 1995-297, 70 T.C.M. (CCH) 1, 4-5 (1995) ("Repayment before a tax audit is, of course, more persuasive evidence of an intention to create a debt than repayment after such an audit has commenced.").

**[*63]** $176,194,052, approximately $325 million less than the outstanding balance at the end of 2006. The continuous repayments that resulted in substantial net reductions coupled with interest payments are significant evidence of debt.[48] Mr. Moses determined that the advances were entirely repaid with interest in 2011. We find this credible.

### 3. Ability To Repay

Finally, we find that Dynamo had the ability to repay. Inadequate capitalization indicates that the taxpayer cannot repay the debt.[49] Both sides called experts to testify about Dynamo's ability to repay the advances it received from Beekman. Petitioners called two experts, Professor Shaked and Dr. Chambers, and the Commissioner called one expert, Mr. Lucas.

---

[48]See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. at 381.

[49]Dixie Dairies Corp. v. Commissioner, 74 T.C. at 496 (explaining, in a debt-equity case, that "[o]f principal importance are: the 'thinness' of the capital structures in relation to debt; the risk involved in making the advances; and the availability of outside sources of funds"); Rutter v. Commissioner, T.C. Memo. 2017-174, at *25 (explaining, in a debt-equity case, that "[a] company's capitalization is relevant to determining the level of risk associated with repayment"); NA Gen. P'ship & Subs. v. Commissioner, 103 T.C.M. (CCH) 1916.

**[*64]** It is within the sound discretion of our Court to admit or exclude expert testimony.[50] "We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate."[51] "Thus we have rejected expert testimony where the witness' opinion of value was so exaggerated that his testimony was incredible."[52] We are not bound by the opinion of an expert witness when that opinion contradicts our own sound judgment.[53] We have broad discretion to evaluate "the overall cogency of each expert's analysis."[54] Moreover, an expert who is merely an advocate of a party's position does not assist the Court to understand the evidence or to determine a fact in issue.[55]

We will start with Mr. Lucas. After reviewing Mr. Lucas' report, his 26 pages of errata, and his testimony, we are not persuaded that his opinion is helpful

---

[50]Salem v. United States Lines Co., 370 U.S. 31, 35 (1962); Estate of Crossmore v. Commissioner, T.C. Memo. 1988-494, 56 T.C.M. (CCH) 483, 486 (1988).

[51]Parker v. Commissioner, 86 T.C. at 561.

[52]Parker v. Commissioner, 86 T.C. at 561.

[53]Parker v. Commissioner, 86 T.C. at 561.

[54]Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998) (quoting Sammons v. Commissioner, 838 F.2d 330, 333 (9th Cir. 1988), aff'g T.C. Memo. 1986-318).

[55]Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 19-20 (1995), aff'd, 98 F.3d 194 (5th Cir. 1996).

[*65] to the Court in understanding the evidence or determining the facts in issue. Mr. Lucas' report was plagued with errors. He admitted to using incorrect information in conducting his analysis, such as understating the revenue forecasting by approximately $575 million in his cashflow analysis and overstating capital expenditures. He admitted that his model was flawed and that when he tried to account for the volatility, it failed. He also admitted that he deferred to the Commissioner when choosing the model on which to base his analysis. Moreover, his testimony indicated a lack of familiarity with probabilities, the very subject about which he testified. Because we find that Mr. Lucas was not credible and his opinion was not helpful to deciding these cases, we disregard his report, his errata report, and his testimony. If we were to credit his report and testimony, after accounting for errors, it largely supported petitioners' claim that Dynamo would have been able to refinance its debts.

Turning to Professor Shaked and Dr. Chambers, we find their opinions credible and helpful in deciding these cases. Professor Shaked determined that Dynamo had the ability to repay. Both Professor Shaked and Dr. Chambers determined that Dynamo's position would have been viewed favorably by third parties, and Dr. Chambers determined that Dynamo would have been able to receive loans on similar terms from third parties.

**[\*66]** Professor Shaked determined that Beekman reasonably expected Dynamo to repay its debts as they became due. He determined that Dynamo was able to repay both its short-term and long-term debts. In his short-term analysis, Professor Shaked determined that Dynamo had the ability to pay interest in each year because of its highly liquid asset profile. In his long-term analysis, Professor Shaked determined that Dynamo had the earning capacity to pay interest expenses and repay principal in 15 years. He determined that Dynamo's break-even rate, the lowest rate of return on assets at which Dynamo could still make interest payments on its debt, was 2.3%-4.4%, which was significantly lower than the projected rate of return of 15% on assets. We find Professor Shaked's assumptions reasonable, his analysis credible, and his findings persuasive. Accordingly, we adopt his opinion and find that Dynamo had the ability to repay.

Petitioners' experts also looked to how third parties would view Dynamo's ability to pay, and they determined that third parties would view Dynamo's position favorably. Professor Shaked determined that Dynamo's equity cushion was between $124 million and $292 million. An "equity cushion" is the amount by which the business' assets exceeds the business' debt. We have previously explained that a large equity cushion is important to creditors because it affords

[*67] them protection if the borrower encounters financial stress.[56] He determined that this large equity cushion would constitute acceptable credit risk and lenders would have a greater degree of assurance of repayment.

Petitioners' experts determined that Dynamo was adequately capitalized on a "net debt" basis. A company's capitalization is relevant to determining the level of risk associated with repayment.[57] They explained that when companies have high levels of cash, it is more appropriate to analyze debt-to-equity ratios on a "net debt" basis. To reach this calculation they subtracted the cash and marketable securities from debt and the business enterprise value. In other words, they subtracted the value of the Dynamo Fund, the hedge fund portfolio, from their evaluation. Professor Shaked determined a debt-to-equity ratio ranging from .05x to 1.7x from 2005 to 2007. This figure was slightly higher than for comparable companies but still within a reasonable range. Likewise, Dr. Chambers determined that Dynamo had adequate capital on a net debt basis. Petitioners' experts determined that Dynamo would have been viewed favorably by third-party lenders. Dr. Chambers determined that on the basis of this capital adequacy, Dynamo could have obtained loans on substantially similar economic terms.

---

[56]Rutter v. Commissioner, at *26-*27.

[57]Rutter v. Commissioner, at *25-*27.

[*68] The Commissioner alleges that we should find that Dynamo was not adequately capitalized because the Dynamo Fund held marketable securities that had "lock-up" dates. However, Dr. Chambers credibly testified that he reviewed the lock-up periods for the Dynamo Fund and determined that all but one expired before January 1, 2006, the date Beekman transferred the Dynamo Fund to Dynamo. Professor Shaked credibly testified that there was a market for purchasing these hedge funds. We find the testimony of both credible and hold that Dynamo was adequately capitalized during the years in issue.

The experts' findings that Dynamo had the ability to repay coupled with the fact that Dynamo actually obtained substantial third-party loans, such as the $90 million loan on the Verano property, demonstrate that Dynamo would have been able to receive loans on substantially similar terms.

C.    Conclusion

After analyzing the facts, we hold that Dynamo and Beekman entered into a bona fide creditor-debtor relationship. At the time the advances were made, Dynamo had an unconditional obligation to repay the loans, and Beekman had an unconditional intent to be repaid. A bona fide loan precludes a constructive

[*69] distribution.[58]  Because we found that the advances were bona fide debt, the advances are not constructive distributions.  Likewise, Dynamo is entitled to deduct the interest expenses.

III.    Property Transactions

The Commissioner alleges Beekman made constructive distributions to its shareholders to the extent that property was transferred from Beekman to Dynamo for less than fair market value.  Fair market value has been defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."[59] The fair market value of property is based on the "highest and best use" of the property as of its relevant valuation date.[60]  In determining highest and best use, we must examine the suitability of the property's current use under existing zoning and marketing conditions, together

---

[58]Schnallinger v. Commissioner, T.C. Memo. 1987-9, 52 T.C.M. (CCH) 1311, 1314 (1987).

[59]United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-1(b), Estate Tax Regs.); Marine v. Commissioner, 92 T.C. 958, 982 (1989), aff'd, 921 F.2d 280 (9th Cir. 1991).

[60]Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); see Hilborn v. Commissioner, 85 T.C. 677, 689 (1985).

[*70] with any realistic alternative uses.[61]  The determination of the fair market value of property is a question of fact that must be resolved after consideration of all of the evidence in the record.[62]

Petitioners allege that we should find that the amounts that Dynamo and Beekman paid to transfer the properties were the fair market values because they are experts in the property development industry.  We disagree.  Transfers between family members or entities controlled by family members are subject to special scrutiny.[63]  Accordingly, independent experts provide a better analysis of the price at which property would change hands between a willing buyer and a willing seller.

As is common in valuation cases, the parties called experts to show the fair market values of the properties transferred.  The Commissioner called two experts, Mr. Friedman and Dr. Diskin.  Petitioners called one expert, Mr. Slade.

---

[61]Hilborn v. Commissioner, 85 T.C. at 689.

[62]Jarre v. Commissioner, 64 T.C. 183, 188 (1975); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965).

[63]Perry v. Commissioner, 92 T.C. at 481; Estate of Lockett v. Commissioner, T.C. Memo. 2012-123, 103 T.C.M. (CCH) 1671, 1676 (2012).

[*71] Expert opinion sometimes aids the Court in determining value; other times, it does not.[64] As with the lending experts, we are not bound by the opinions or formulas of valuation experts when those opinions contravene our judgment. Instead, we may reach a determination based on our own examination of the record.[65] We may be selective in the use of any portions of their opinions.[66] The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.[67] Consequently, we take into account expert opinion testimony only to the extent that it aids us in arriving at the fair market values of the properties.

A.    The Domani Property

The Domani property was seven acres of real property that Dynamo intended to develop into a high-rise tower in 2005. Beekman sold the property to Dynamo by increasing the outstanding balance due from Dynamo by $12,261,301.

Only petitioners called an expert to value the property retrospectively. Petitioners called Mr. Slade. Mr. Slade determined that the highest and best use of

---

[64]See Laureys v. Commissioner, 92 T.C. 101, 129 (1989).

[65]Estate of Davis v. Commissioner, 110 T.C. at 538.

[66]Parker v. Commissioner, 86 T.C. at 562.

[67]Estate of Davis v. Commissioner, 110 T.C. at 538.

**[*72]** the property would be as a multifamily or mixed-use project. He valued the property at $23,500,000. The Commissioner did not call an expert to value the property. The Commissioner alleges that the fair market value of the property was the accumulated cost incurred by Beekman, or $25,882,872.

We find that the fair market value of the property was $23,500,000. Although the Commissioner alleges that the fair market value is the accumulated cost, the fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."[68] This definition does not include the seller's cost. Mr. Slade determined that the fair market value of the property was $23,500,000. His testimony is unrebutted, and we find no reason to question his credibility. Accordingly, we find the fair market value was $23,500,000.

Petitioners argue that Dynamo assumed $17 million of debt from Beekman. We disagree. The record establishes that, after Dynamo purchased the property, Dynamo received a loan from Bank of America for $17 million; the record does not establish that this was the assumption of a Beekman debt. Accordingly,

---

[68]Cartwright, 411 U.S. at 551 (quoting sec. 20.2031-1(b), Estate Tax Regs.); Marine v. Commissioner, 92 T.C. at 982.

[*73] Beekman transferred the Domani property to Dynamo at $11,238,699 below fair market value. Because the amount of the transfer reflected in the amendment to answer was greater than that determined in the notice of deficiency, the Commissioner bears the burden with respect to the increase. The Commissioner has met his burden.

### B. The Grande at Mirasol Property

The Grande at Mirasol property was approximately 42 acres of real property that was developed into 475 low-rise units that operated as an apartment complex. Beekman was aggressively pursuing a conversion of the complex into condominiums. On November 17, 2005, Beekman sold the property to Dynamo for $40,684,094. As payment for the property Dynamo increased the outstanding balance due to Beekman by $2,684,094 and assumed a $38 million liability.

Both parties' experts valued the property retrospectively. The principal difference between the parties' experts is whether the highest and best use of the property would be a condominium conversion. The Commissioner's expert, Dr. Friedman, determined the highest and best use of the property was as a condominium conversion project and determined that the fair market value of the Grande at Mirasol property was $121,400,000. Petitioners' expert, Mr. Slade, determined that the highest and best use of the property was to maintain the

[*74] property as an apartment complex and that the fair market value of the Grande at Mirasol property was $56 million. Accordingly, we must determine whether the highest and best use of the property was as a condominium conversion or as an apartment complex.

We find that the highest and best use of the Grande at Mirasol property was as a condominium conversion. Before Beekman sold the property to Dynamo, Beekman was actively pursuing a condominium conversion. Beekman sent the State of Florida, Bureau of Condominiums a notice of their intent to convert. In September 2005 Beekman and the previous land owner entered into an agreement by which Dynamo could convert the property to a condominium if it paid base compensation of $4,848,618 and bonus compensation if the gross sale proceeds exceeded approximately $136 million. After Dynamo purchased the property, Dynamo continued to pursue a condominium conversion. Dynamo sent letters to the tenants informing them of the conversion. Dynamo subsequently received approval from the Bureau of Condominiums to convert. Nothing in the record suggests that Dynamo and Beekman were precluded from converting the apartments.

Mr. Slade considered condominium conversion, but erroneously determined that it was restricted. He had not seen the agreement between Beekman and the

[*75] previous owner allowing Dynamo to convert the property to condominiums if Dynamo paid compensation. At trial he agreed that if there were no restrictions, he would have used properties that were converted to condominiums in his comparables analysis.

Because we find that the highest and best use of the Grande at Mirasol property was as a condominium conversion, we adopt Dr. Friedman's valuation. However, Dr. Friedman did not account for the $4,848,618 that Dynamo would pay to the previous property owner to convert. Accordingly, the fair market value of the property was $116,551,382, or Dr. Friedman's value of $121,400,000 less the $4,848,618 that would have been required to be paid to convert the property. Beekman transferred the Grande at Mirasol property to Dynamo for $75,867,288 below fair market value. Because the amount of the transfer reflected in the amendment to answer was greater than that determined in the notice of deficiency, the Commissioner bears the burden with respect to the increase. The Commissioner has met his burden to the extent described above.

C.     The Mainstreet Properties

The Mainstreet properties are a group of properties that Beekman transferred to Dynamo for $9,850,000.

**[*76]**          1.          The Mainstreet Commercial Property

The Mainstreet commercial property consists of two lots, A and C, and a tract, R.  Lot A, lot C, and tract R were .933 acres, 21.05 acres, and 1.004 acres, respectively.

The Commissioner called Dr. Diskin to value the Mainstreet commercial property retrospectively.  He determined the highest and best use of lot A, lot C, and tract R was as commercial offices, retail, and a right of way, respectively.  He concluded that the fair market value of the Mainstreet commercial property was $4,103,000.   On brief, petitioners did not contest this value.  We find no reason to question Dr. Diskin's credibility on this valuation. We find that the fair market value for the Mainstreet commercial property is $4,103,000.

2.          The Mainstreet Office Building

The Mainstreet Office Building property, which consists of 2.35 acres of land that was developed as an office building and a .85-acre drainage easement, sold on April 6, 2006.

Petitioners called Mr. Slade to value the Mainstreet Office Building property retrospectively.  Mr. Slade determined that its highest and best use was to remain an office building, and he valued it at $850,000.  The Commissioner did not call an expert.

[*77] We find that the fair market value of the Mainstreet Office Building property was $850,000. Mr. Slade's testimony is unrebutted, and we find no reason to question his credibility on this valuation.

### 3. The Mainstreet Vacant Property

The Mainstreet vacant property consists of 2.39 vacant acres that Beekman sold to Dynamo on November 29, 2005.

The Commissioner called Dr. Diskin to value the Mainstreet vacant property. Dr. Diskin prepared a retrospective appraisal. He determined that its highest and best use was as a park or public facility or for donation to the city. Using the sales comparison method, Dr. Diskin determined that the fair market value of the Mainstreet vacant property was $120,000. Petitioners did not submit rebuttal evidence.

We find that the fair market value of the Mainstreet vacant property was $120,000. Dr. Diskin's testimony was unrebutted, and we find no reason to question its credibility on this valuation.

### 4. The G.O. Team Property

The G.O. Team property consists of 17 lots on 33.85 acres, a 24.98-acre parcel of land that is encumbered by a lake, and a 3.40-acre easement. The

[*78] easement and four of the lots were industrial property during the years in issue. The remaining portion consisted of 13 lots and the parcel that included the lake.

### a. The Industrial Portion

Beekman transferred the industrial portion to Dynamo on April 6, 2006. It consists of four vacant lots totaling 6.68 acres and a 3.40-acre easement.

Both parties' experts valued the industrial portion retrospectively. Both experts determined the highest and best use was industrial. The principal differences between the parties' expert valuations are the price per square foot and the method used to value the property. The Commissioner's expert, Dr. Diskin, relied on comparable properties, which had prices per square foot that ranged from $4.92 to $10.17. He determined that the industrial portion's price per square foot was $5 and the total fair market value was $1,455,000. Similarly, petitioners' expert, Mr. Slade, relied on comparable properties; however, his comparable properties ranged in price from $2 to $5.19 per square foot. He found other higher priced properties that he excluded because he determined that their road access was superior. He determined that the industrial portion's price per square foot was between $2 and $2.25, the lowest of all the comparable properties. He then discounted the price per square foot by 16% for sales commissions, general

[*79] administrative costs, developer's profit, real estate taxes, and miscellaneous expenses, and arrived at a fair market value of $530,000.

We find that the fair market value of the industrial portion was $1,455,000. Mr. Slade's valuation is unreasonably low. He chose the lower end of the comparable properties and then discounted that value using a discounted sales approach. Dr. Diskin's valuation was reasonable. Accordingly, we adopt his valuation.

### b. The Remaining Portion

Beekman sold the remaining portion to Dynamo on April 6, 2006. The remaining portion consisted of 13 industrial lots and a 24.98-acre parcel encumbered by a lake. The lake left only 8.5 acres of the 24.98-acre lot available to be developed.

Both parties' experts retrospectively valued the remaining portion. The principal difference between the experts' values was whether the highest and best use of this land should be industrial, based on current zoning, or residential, based on a future land use change. The Commissioner's expert, Dr. Diskin, determined that the highest and best use of the property was residential. He clustered 271 dwellings on the land, relying on an ordinance amending the future land use map. Using his sales comparison approach, he determined that the fair market value was

**[*80]** $7,900,000.  Petitioners' expert, Mr. Slade, determined that the remaining

portion was industrial and that the total value of the remaining portion was

$2,990,000.

We agree with Dr. Diskin that the highest and best use was residential.  In

determining highest and best use, we must examine the suitability of the property's

current use under existing zoning and market conditions, together with any

realistic alternative uses.[69]  A potential highest and best use for property can be

considered even though zoning laws prohibit the potential use on the date of the

contribution.[70]  However, the projected highest and best use cannot be remote,

speculative, or conjectural.[71]  The fair market value of the property must be

adjusted for any restriction on its marketability.[72]  The city council of Port St.

Lucie passed Ordinance 04-107, amending the future land use map from industrial

---

[69]Hilborn v. Commissioner, 85 T.C. at 689; Crowley v. Commissioner, T.C. Memo. 1990-636, 60 T.C.M. (CCH) 1447, 1449 (1990), aff'd, 962 F.2d 1077 (1st Cir. 1992).

[70]Olson v. United States, 292 U.S. 246, 257 (1934); Crowley v. Commissioner, 60 T.C.M. (CCH) at 1449.

[71]Olson, 292 U.S. at 257.

[72]Cooley v. Commissioner, 33 T.C. 223, 225 (1959), aff'd, 283 F.2d 945 (2d Cir. 1960); see also Olson, 292 U.S. at 257.

[*81] to low-density residential.  Real estate buyers often purchase property because of its anticipated future benefits, which can differ from its present use.[73]

Mr. Slade did not address or make any adjustments for the change in land use in his valuation.  Accordingly, we do not find his report credible on this point.  Dr. Diskin, on the other hand, determined that between residential and industrial, residential was the highest and best use.  We find that the highest and best use was residential.  It was reasonably probable that the land would be developed into residential properties, which would increase its value.

However, we find Dr. Diskin's valuation flawed.  The lake on the property reduces the area that can be developed and as a result the overall value of the property.  Dr. Diskin did not adjust the valuation to account for the lake in the middle of the 24.98-acre parcel.  Accordingly, we do not find his approach reasonable.  While it is reasonable to conclude that density could be increased on the land that could be developed, Dr. Diskin did not address the extent to which density could be increased or the effect of increased density on the value of residential property.  We reduce his valuation by 20%, to account for the increased density resulting from the undevelopable portion of the land, and find the value to be $6,320,000.

---

[73]Frazee v. Commissioner, 98 T.C. 554, 578 (1992).

**[*82]**     5.     Conclusion on the Mainstreet Properties

In conclusion, Beekman sold the Mainstreet properties to Dynamo for $9,850,000. The fair market values of the Mainstreet commercial, office building, vacant, industrial, and remaining properties were $4,103,000, $850,000, $120,000, $1,455,000, and $6,320,000, respectively, and in total, $12,848,000. Accordingly, Beekman transferred the Mainstreet properties to Dynamo for $2,998,000 less than their total fair market value. Because the amount of the transfer reflected in the amendment to answer was greater than that included in the notice of deficiency, the Commissioner bears the burden with respect to the increase. The Commissioner has met his burden to the extent described above.

D.     The Verano Property

The Verano property was 3,030 acres of real property planned for development into 6,300 residential units. On February 28, 2006, Beekman sold the property to Dynamo for $49,477,298.

Both parties' experts valued the Verano property retrospectively. The principal difference between the valuations is the amount of weight given to the Centex property. The Commissioner's expert, Dr. Friedman, determined that the highest and best use of the property was as a master-planned community and that the fair market value of the Verano property was $140 million. Petitioners' expert,

[*83] Mr. Slade, determined that the highest and best use of the property was as a mixed-use development with a fair market value of $101.5 million. A $38.5 million discrepancy resulted.

We find that Dr. Friedman's approach was reasonable and Mr. Slade's was not. Both Dr. Friedman and Mr. Slade found the Centex property to be comparable to the Verano property. Petitioners and their expert, Mr. Slade, argue that the Centex property had better road access than the Verano property and that the proper valuation should reflect that. We disagree. On the basis of all the evidence presented, including the development plan, we conclude that the Verano property would have road access similar to that of the Centex property. Accordingly we adopt Dr. Friedman's valuation.

We find Dr. Friedman's approach to be reasonable and find that the fair market value of the Verano property was $140 million. Accordingly, Beekman transferred the Verano property to Dynamo at $90,522,702 below fair market value.

**[*84]** E.     Other Transfers

        1.     TOUSA/Kolter, LLC

In January 2005 Beekman made a $17,500,000 partnership contribution to TOUSA/Kolter, LLC, and received a 50% interest in it.  Beekman's contribution was subsequently reduced by $3 million.  In 2005 TOUSA/Kolter, LLC, purchased the Monterra property.  Beekman transferred its TOUSA/Kolter, LLC interest to Dynamo in early 2005 for $14,500,000 by increasing the outstanding balance due from Dynamo.

The Commissioner alleges that the fair market value of the partnership interest is either $17,500,000 or some higher value based on the value of the property that TOUSA/Kolter, LLC, purchased.  Because the valuation of the 50% share of TOUSA/Kolter, LLC, was not addressed in the notice of deficiency, the Commissioner bears the burden of proof on this issue.[74]  The Commissioner did not present any evidence of the fair market value of the property, and petitioners explained that the capital contribution was subsequently reduced by $3 million.  Accordingly, we find that the Commissioner failed to meet his burden to show that Beekman transferred the TOUSA/Kolter, LLC interest to Dynamo at less than fair market value.

---

[74]See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 507.

**[*85]** 2. The Dynamo Fund

During the first half of 2006 Beekman transferred the assets in the Dynamo Fund to Dynamo for $198,025,037. Payment for the Dynamo Fund was recorded as an increase to the outstanding balance due from Dynamo. The parties agree that the value of the Dynamo Fund was $228,234,808 on December 31, 2005. Accordingly, Beekman transferred the Dynamo Fund to Dynamo for $30,209,771 less than fair market value.

3. Other Transfers

Beekman transferred various other properties to Dynamo during the years in issue. These include the Jag of Palm Beach property, the Bear's Club property, the Grande Sarasotan property, and the Heathrow Oaks property. The Commissioner bears the burden of proof as to each of these items because none was raised in the notice of deficiency.[75] The Commissioner has not presented any evidence that these properties were transferred at less than fair market value. Accordingly, we find that the amounts reported on the general ledgers were the fair market values of the properties.

---

[75]See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. at 507.

**[\*86]** F.    Conclusion

We find that Beekman transferred properties to Dynamo for less than fair market value.  Beekman transferred the Domani property, the Grande at Mirasol property, the Mainstreet properties, the Verano property, and the Dynamo Fund to Dynamo for $11,238,699, $75,867,288, $2,998,000, $90,522,702, and $30,209,771, respectively, less than the fair market values.  Accordingly, Beekman transferred $210,836,460 of additional value to Dynamo.  We must determine whether this amount was a constructive distribution.

IV.    Constructive Distribution

It is well settled that a transfer of property from one entity to another for less than adequate consideration may constitute a constructive distribution to an individual who has ownership interests in both entities.[76]  A bargain sale, including a bargain sale based on competing property valuations, between related parties, however, does not automatically result in a constructive distribution.[77]

---

[76]Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 640; Cox Enters., Inc., & Subs. v. Commissioner, T.C. Memo. 2009-134, 97 T.C.M. (CCH) 1767, 1774 (2009).

[77]Davis v. Commissioner, T.C. Memo. 1995-283, 69 T.C.M. (CCH) 3004, 3007 (1995); see also Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 868 (3d Cir. 1974), aff'g in part, rev'g in part T.C. Memo. 1972-238; Cox Enters., Inc., & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1775.

[*87] Courts have outlined a two-prong analysis to determine whether a transfer resulted in a constructive distribution. The first prong, the objective test, asks whether the transfer caused "funds or other property to leave the control of the transferor corporation and * * * [whether] it allow[ed] the stockholder to exercise control over such funds or property either directly or indirectly through some instrumentality other than the transferor corporation."[78] The second prong, the subjective test, a "crucial inquiry" in the constructive distribution determination, asks whether the transfer occurred primarily for the common shareholder's personal benefit rather than for a valid business purpose.[79] Both prongs must be satisfied for a court to find a constructive distribution.[80]

A.    Objective Prong

Because the common shareholder does not directly receive funds or property in a transfer between entities, such a transfer is a distribution if: (1) the transferred funds leave the control of the transferring entity and (2) the owner

---

[78]See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 641 (quoting Sammons v. Commissioner, 472 F.2d 449, 451 (5th Cir. 1972), aff'g in part, rev'g in part T.C. Memo. 1971-145.

[79]Wilkof v. Commissioner, T.C. Memo. 1978-496, 37 T.C.M. (CCH) 1851-31, 1851-38 (1978), aff'd, 636 F.2d 1139 (6th Cir. 1981).

[80]Sammons v. Commissioner, 472 F.2d at 451; Cox Enters., Inc., & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1774.

[*88] controls the funds, directly or indirectly, through some means other than the transferor.[81] Considering the control Mrs. Moog exercised over Beekman and Dynamo through 2020072 Ontario, Ltd., we conclude the first prong of the two-prong analysis for a constructive distribution is satisfied. Mrs. Moog had the ability to divert the value of the property to her chosen recipient because of her control.

### B. Subjective Prong

The subjective prong asks the Court to consider whether the transfer occurred primarily for the benefit of the common shareholder, rather than for a valid business purpose. In applying the subjective prong "the search for this underlying purpose usually involves the objective criterion of <u>actual</u> primary economic benefit to the shareholders as well".[82] The Court of Appeals for the Eleventh Circuit states the point as follows: "In determining whether the primary purpose test has been met, we must determine not only whether a subjective intent

---

[81]<u>Sammons v. Commissioner</u>, 472 F.2d at 453; <u>Davis v. Commissioner</u>, 69 T.C.M. (CCH) at 3007.

[82]<u>Cox Enters., Inc., & Subs. v. Commissioner</u>, 97 T.C.M. (CCH) at 1774 (quoting <u>Kuper v. Commissioner</u>, 533 F.2d 152, 160 (5th Cir. 1976)); <u>see also</u> <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, 730 F.2d at 641.

[*89] to primarily benefit the shareholders exists, but also whether an actual primary economic benefit exists for the shareholders."[83]

If the primary purpose is a valid business purpose, then the primary purpose is not for the shareholder benefit.[84] The benefit to the shareholder must be "direct", a term broadly construed.[85] For example, courts have found a benefit to the shareholder when the primary purpose of the transfer is to or for the benefit of a member of the shareholder's family.[86]

---

[83]Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 641.

[84]Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 641; Sammons v. Commissioner, 472 F.2d at 452; Cox Enters., Inc., & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1774.

[85]Gilbert v. Commissioner, 74 T.C. 60, 64 (1980); Wilkof v. Commissioner, 37 T.C.M (CCH) at 1851-38; see also Rushing v. Commissioner, 52 T.C. 888, 894 (1969) ("[W]hatever personal benefit, if any, Rushing [the sole shareholder of the transferor and transferee corporations] received was derivative in nature. Since no direct benefit was received, we cannot properly hold he received a constructive dividend."), aff'd, 441 F.2d 593 (5th Cir. 1971).

[86]Green v. United States, 460 F.2d 412, 419-421 (5th Cir. 1972); Byers v. Commissioner, 199 F.2d 273, 275 (8th Cir. 1952), aff'g a Memorandum Opinion of this Court; Epstein v. Commissioner, 53 T.C. 459, 474-475 (1969) (explaining that it is firmly established that when a corporation makes a transfer of property for no or insufficient consideration "to a member of the stockholder's family, whether it be directly or in trust, the stockholder has enjoyed the use of such property no less than if it had been distributed to him directly").

[*90] Petitioners raise various arguments that Beekman had a business purpose for making the bargain sales. Petitioners argue that Dynamo and Beekman had a specific business purpose, namely, that the transfers enabled Dynamo to revitalize the West Palm Beach neighborhood surrounding Beekman's projects and bolster the Kolter brand name, which would financially benefit Beekman. In making this argument, petitioners rely on Rushing v. Commissioner.[87]

In Rushing, a sole shareholder of two corporations was held not to have received a constructive distribution when one corporation advanced funds to a sister corporation.[88] We held that any benefit to the sole shareholder was indirect because the advancing corporation, a corporation developing a shopping center, had a significant interest in the success of the sister corporation, a corporation developing a nearby residential development.[89] We explained that the success of the development of home sites on the land adjacent to the shopping center would inevitably lead to increased use of the shopping center.[90] Petitioners' reliance is misplaced. There is no reason that Beekman was required to transfer the

---

[87]Rushing v. Commissioner, 52 T.C. 888.

[88]Rushing v. Commissioner, 52 T.C. at 894.

[89]Rushing v. Commissioner, 52 T.C. at 894.

[90]Rushing v. Commissioner, 52 T.C. at 894.

[*91] properties to Dynamo to revitalize West Palm Beach. Beekman, or one of Beekman's subsidairies, could have undertaken the project. This same logic applies to strengthening the Kolter brand name. Beekman could have just as easily developed the properties using the Kolter brand name.

Petitioners argue that Beekman's directors held fiduciary duties to the beneficiaries of the Canadian trusts not to deplete the value of Beekman and therefore Beekman could not have underpriced the property. Petitioners rely on Cox Enters.,[91] where we held that there was not a constructive distribution. In Cox Enters., one corporation contributed an asset to a partnership in exchange for a partnership interest the value of which was lower than the value of the contributed asset, effectively transferring value to the other partners.[92] The other partners were two family partnerships.[93] We found that the primary purpose was not to benefit the other partners, in part because the corporation's majority shareholder and directors would have had to breach their fiduciary duties.[94] This would have

---

[91]Cox Enters., Inc. & Subs. v. Commissioner, 97 T.C.M. (CCH) 1767.

[92]Cox Enters., Inc. & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1770-1771.

[93]Cox Enters., Inc. & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1768.

[94]Cox Enters., Inc. & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1776-

**[*92]** resulted in a financial detriment to the minority shareholders who did not own any interest in the partnerships.[95]

Petitioners ask that we follow this line of reasoning because the beneficiaries of the Canadian trusts are not identical to the beneficiaries of the U.S. trusts. Petitioners argue that the directors, officers, and controlling shareholders did not breach any duties to the Canadian trusts by depleting value from Beekman. We disagree. Cox Enters. involved a single instance of undervaluing an interest. In these cases, we have found five bargain sales exceeding $200 million. Unlike Cox Enters., we find that the directors, officers, and controlling shareholder acted for the benefit of the U.S. trusts and to the detriment of the Canadian trusts.

We agree with the Commissioner that the primary intent and benefit was for Dynamo and by extension, the dynasty trusts. The bargain sale properties went to Dynamo, enhancing its value. The properties put more equity in Dynamo and freed up its liquid assets. This allowed Dynamo to develop its Florida business and increased Dynamo's borrowing capability. All of this directly benefited the

---

[94](...continued)
1777.

[95]Cox Enters., Inc. & Subs. v. Commissioner, 97 T.C.M. (CCH) at 1777.

**[\*93]** dynasty trusts for the benefit of Christine and Mr. Julien and furthered Mrs.

Moog's estate planning.  Accordingly, Beekman made deemed distributions.

## V.     Withholding Taxes

Having found that constructive distributions occurred, we must determine

their tax treatment and Beekman's withholding obligation.

### A.     Distributions in General

A distribution of property made by a corporation to a shareholder with

respect to its stock is treated as prescribed by section 301(c).[96]  Section 301(c)(1)

provides that a shareholder must include in gross income the portion of the

distribution that is a dividend.[97]  Section 316(a) defines a dividend as any

distribution of property made by a corporation to its shareholders (1) out of its

accumulated earnings and profits or (2) out of its earnings and profits for the

taxable year.  If all or part of the distribution is not a dividend, that amount is a

nontaxable return of capital to the extent of the shareholder's adjusted basis in the

---

[96]Sec. 301(a).

[97]Sec. 316(a); Welle v. Commissioner, 140 T.C. 420, 422 (2013); see also sec. 61(a)(7).

[*94] stock and any amount in excess of the shareholder's adjusted basis is taxable capital gain.[98]

Beekman's estimated earnings and profits were $34,504,980 and $141,115,279 on June 30, 2005 and 2006, respectively. Accordingly, Beekman's constructive distribution of $210,836,460 exceeded its earnings and profits. Petitioners allege that the earnings and profits should be increased by the amount of the underpricing on the bargain sale properties under section 312(b)(1). The Commissioner concedes that Beekman is entitled to an increase in earnings and profits in the amount of the deemed distributions.[99]

---

[98]Sec. 301(c)(2) and (3).

[99]We expect the parties to resolve the extent to which any distribution may or may not have been made out of earnings and profits through computations under Rule 155.

**[\*95]** B.     Withholding Taxes

Distributions under section 301(c) are potentially subject to withholding taxes, and the parties dispute whether Beekman had a duty to withhold.  In general, section 1442 imposes a withholding tax on dividends to foreign corporations, and section 1445(e)(3) imposes a withholding tax on distributions not out of earnings and profits where the distributing corporation is a U.S. real property holding corporation.

1.     Withholding Taxes on Dividends

Section 1442(a) generally requires the payor of a U.S. source dividend to a foreign corporation to deduct and withhold tax at the source.  Section 881(a) imposes a tax of 30% on various kinds of income including dividends received from U.S. sources by a foreign corporation to the extent the dividend received is not effectively connected with the conduct of a trade or business within the United States.[100]  Generally, a dividend is from a U.S. source when the dividend is from a

---

[100]A "foreign corporation" is a corporation that is not a domestic corporation, and a "domestic corporation" is a corporation created or organized in the United States or under the law of the United States or of any State.  Sec. 7701(a)(4) and (5).  Canada Square is a foreign corporation because it was organized under the laws of Canada, and Beekman is domestic corporation because it was organized under the laws of Delaware.

[*96] domestic corporation.[101] The rate of tax imposed on the dividend is reduced to 5% by the U.S.-Canada tax treaty for shareholders owning at least 10% of the source company.[102]

Beekman, a domestic corporation, made a constructive distribution to Canada Square, a foreign corporation. Beekman was required to withhold a tax equal to 5% of the portion of the distribution that was a dividend, that is, that portion that was from Beekman's earnings and profit. Beekman failed to withhold a tax equal to 5% of the dividends distributed to Canada Square in 2005 and 2006. Accordingly, we find that Beekman was required to withhold 5% on the portion of the distribution that was a dividend.

Petitioners ask us to limit our finding to distributions from Beekman Vista's earnings and profits. Constructive distributions often arise in situations where the corporation has excess earnings and profits and is trying to move profits out of the

---

[101]Sec. 861(a)(2).

[102]Third Protocol Amending the Convention With Respect to Taxes on Income and Capital, art. 10, Can.-U.S., Sept. 26, 1980, T.I.A.S. No. 11087, as in effect from 2004-2006.

[*97] corporation.[103]  However, we have explained that corporations can make constructive distributions in excess of earnings and profit.[104]

Petitioners also ask that if we find a constructive distribution, we should reduce the amount of the distribution by the amount Beekman owes to Canada Square as repayment of a loan.  Taxpayers are bound by the form of their transactions and may not argue that the substance of their transaction differs from the consequences.[105]  Beekman did not reduce the amount due to Canada Square for the amount of the constructive distribution.  Accordingly, Beekman cannot recast the transaction as a loan repayment.

2.    Withholding Taxes on Nondividend Distributions

A domestic corporation that is or has been a U.S. real property holding corporation at any time during the five-year period ending on the date of

---

[103]See, e.g., Welle v. Commissioner, 140 T.C. at 426; Davis v. Commissioner, 69 T.C.M. (CCH) 3004.

[104]Le v. Commissioner, T.C. Memo. 2003-219, 86 T.C.M. (CCH) 116, 121 (2003) ("Under section 301(c), a constructive distribution is taxable to the shareholder as a dividend only to the extent of the corporation's earnings and profits. Any excess is a nontaxable return of capital to the extent of the shareholder's basis in the corporation.  Any remaining amount is taxable to the shareholder as capital gain.").

[105]Ellinger, 470 F.3d at 1333; Estate of Durkin v. Commissioner, 99 T.C. 561, 571 (1992).

[*98] distribution must withhold taxes when it distributes property to a foreign person in a nondividend section 301 distribution.[106] Subject to exceptions not applicable here,[107] section 1445(e)(3) requires payors to withhold "10 percent of the amount realized by the foreign shareholder."

The Commissioner argues that Beekman should be required to withhold under section 1442 on the dividends out of earnings and profits and under section 1445 on the distributions in excess of earnings and profits. This is consistent with the treatment under the applicable regulations.[108] Section 897(c)(2) defines the term "United States real property holding corporation" as follows:

> The term "United States real property holding corporation" means any corporation if (A) the fair market value of its United States real property interests equals or exceeds 50 percent of (B) the fair market value of -- (i) its United States real property interests, (ii) its interests in real property located outside the United States, plus (iii) any other of its assets which are used or held for use in a trade or business.

Section 897(c)(1) defines "United States real property interest" to mean

> (i) an interest in real property * * * located in the United States or the Virgin Islands, and (ii) any interest (other than an interest solely as a creditor) in any domestic corporation unless the taxpayer establishes (at such time and in such manner as the Secretary by regulations

---

[106]Sec. 1445(e)(3).

[107]Sec. 1445(e)(3); sec. 1.1445-5(e)(3)(i), Income Tax Regs.

[108]Sec. 1.1441-3(c)(4)(i)(B), Income Tax Regs.

[*99] prescribes) that such corporation was at no time a United States real property holding corporation during the shorter of -- (I) the period after June 18, 1980, during which the taxpayer held such interest, or (II) the 5-year period ending on the date of the disposition of such interest.

Section 1.897-2(b)(2), Income Tax Regs., provides an alternative test where the fair market value of the corporation's U.S. real property interest is "presumed" to be less than 50% of the fair market value of the aggregate of its assets "if on an applicable determination date the total book value of the U.S. real property interests held by the corporation is 25 percent or less of the book value of the aggregate of the corporation's assets".

The Commissioner determined that Beekman was a U.S. real property holding corporation during the years in issue. Petitioners rely on the alternative test to show that Beekman was not a U.S. real property holding corporation. However, the alternative test is only a "presumption".[109] The Commissioner determined that Beekman was a U.S. real property holding corporation under section 897(c)(2). Indeed, the record indicates that most of Beekman's assets were U.S. real property interests. The principal difference between the Commissioner's calculation and the calculation put forth by Beekman and Dynamo's expert is the inclusion of property held for sale in the ordinary course of business in total U.S.

---

[109]Sec. 1.897-2(b)(2), Income Tax Regs.

[*100] real property holdings. Beekman and Dynamo have not offered any compelling argument as to why the property should be excluded from the calculation and did not meet their burden to establish that Beekman was not a U.S. real property holding corporation. Beekman's distributions in excess of earnings and profits are subject to 10% withholding.

## VI.    Dynamo Determinations

The tax treatment of any partnership item must be determined at the partnership level.[110] Partnership items include any item required to be taken into account for the partnership's taxable year under subtitle A to the extent that the Secretary has determined by regulation that the item is more appropriately determined at the partnership level.[111] This includes items of income, gain, loss, deduction, or credit, as well as contributions and distributions.[112] The FPAA made several adjustments; however, the parties have resolved most of them. We address the remaining issues.

---

[110]Sec. 6221.

[111]Sec. 6231(a)(3); sec. 301.6231(a)(3)-1(a), Proced. & Admin. Regs.

[112]Sec. 301.6231(a)(3)-1(a), Proced. & Admin. Regs.

**[*101]** A.  Dynamo GP

The Commissioner argues that Dynamo's general partner, Dynamo GP, received a deemed distribution of cash in a 2007 restructuring transaction in an amount equal to the assumption of the advances to the Christine Dynasty Trust and the Julien Dynasty Trust.  Dynamo reported all of the advances between Beekman and Dynamo as recourse debts to Dynamo GP in 2006 and 2007. Petitioners allege that the advances were nonrecourse.  We disagree.

Ordinarily, a taxpayer is bound by the form of a transaction and cannot argue that the substance justifies a different result.[113]  Petitioners' expert, Mr. Moses, determined that the advances were nonrecourse "from a tax return preparer's perspective," but Mr. Moses acknowledged that the returns reported otherwise and that he "recharacterized" the debt as nonrecourse.  Petitioners have offered no other evidence as to why Dynamo should be relieved of its tax reporting position.  We find no basis for the advances to be recharacterized as nonrecourse.  Accordingly, we find the advances were recourse liabilities to Dynamo GP.

---

[113]Selfe v. United States, 778 F.2d 769, 773 (11th Cir. 1985); Framatome Connectors USA, Inc. v. Commissioner, 118 T.C. 32, 47 (2002), aff'd, 108 F. App'x 683 (2d Cir. 2004); Howell v. Commissioner, T.C. Memo. 2012-303, at *13.

[*102] Section 752(b) provides that "[a]ny decrease in a partner's share of the liabilities of a partnership * * * shall be considered as a distribution of money to the partner by the partnership."[114]  Dynamo GP's share of the advances was reduced by the amount of the assumption by the Christine Dynasty Trust, $220 million, and the Julien Dynasty Trust, $146 million.  Accordingly, Dynamo GP is deemed to have received a cash distribution of $366 million.

Petitioners raise the taxability of the distribution to Dynamo GP in their brief.  However, in partnership proceedings such as this one, a partner's tax on a distribution is beyond the scope of the proceedings.[115]

### B.     Christine Dynasty Trust and Julien Dynasty Trust

Partnership items include not only items of immediate tax effect, such as items of income, loss, deduction, or credit, but also determinations as to items such as contributions and distributions.[116]  We turn now to various partnership items of Dynamo.

---

[114]Sec. 1.752-1(c), Income Tax Regs.

[115]Sec. 6230(a)(2).

[116]Sec. 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs.

**[*103]**     1.     Contribution of the Bargain Sale

We previously found that Beekman made a deemed distribution to Mrs. Moog.[117]  Accordingly, Mrs. Moog is deemed to have made a gift to the U.S. trusts in a 60/40 split, where she gave 60% of the value to the Christine Dynasty Trust and 40% to the Julien Dynasty Trust.[118]  The dynasty trusts are deemed to have made a section 721 contribution to Dynamo.

2.     Restructuring Transaction

a.     Deemed Contribution

The Christine Dynasty Trust and the Julien Dynasty Trust made contributions in the amounts of the debt assumptions from the restructuring transaction.  The dynasty trusts assumed Dynamo's liabilities.  Section 752(a) provides that "[a]ny increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership."  The Christine Dynasty Trust and the Julien Dynasty Trust are deemed to have contributed money to the partnership in the amounts of the debt assumptions; that is, the Christine Dynasty Trust and the

---

[117]See Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 641.

[118]See Epstein v. Commissioner, 53 T.C. at 474-475.

[*104] Julien Dynasty Trust are deemed to have contributed $220 million and $146 million, respectively.

### b. Distribution

Dynamo also distributed assets to the dynasty trusts in amounts nearly equal to their debt assumptions. Dynamo distributed $220 million of marketable securities to the Christine Dynasty Trust and $146,666,667, which consisted of $70 million cash and a $76,666,666 note, to the Julien Dynasty Trust.

Section 731(b) provides that "[n]o gain or loss shall be recognized to a partnership on a distribution to a partner of property, including money." Section 731(c)(1) provides that, for purposes of section 731(a)(1), the term "money" includes "marketable securities", which are to be taken into account at fair market value as of the distribution date.[119] Section 731(c)(2)(A) defines the term "marketable securities" to mean "financial instruments * * * which are, as of the date of the distribution, actively traded (within the meaning of section 1092(d)(1))." Section 731(c)(2)(B)(ii) and (C) includes in the meaning of the term "marketable securities" "any financial instrument which, pursuant to its terms or any other arrangement, is readily convertible into, or exchangeable for, money or

---

[119]Countryside Ltd. P'ship v. Commissioner, T.C. Memo. 2008-3, 95 T.C.M. (CCH) 1006, 1009 (2008).

[*105] marketable securities," which includes "stocks and other equity interests, evidences of indebtedness, options, forward or futures contracts, notional principal contracts, and derivatives." Accordingly, Dynamo distributed marketable securities to the Christine Dynasty Trust and cash and marketable securities to the Julien Dynasty Trust.

### C. Interest Expenses

Because we found that the advances were bona fide debt, Dynamo can deduct interest on that debt.[120]

### D. Cancellation of Indebtedness Income

The FPAA asserts as an alternative position that, if amounts transferred from Beekman to Dynamo were bona fide debt, then Dynamo must recognize discharge of indebtedness income at the end of 2007. The Commissioner did not address this issue at trial or on brief, other than to note that he did not advance the argument beyond challenging whether petitioners met their burden. We have already found that Dynamo repaid Beekman by direct repayment, by satisfying Beekman's obligations to third parties, and by providing management services to Beekman. Petitioners met their burden.

---

[120]See sec. 163(a).

**[\*106]** E. Additional Adjustments in the FPAA

Petitioners have stated that they and the Commissioner have resolved several adjustments. To the extent not agreed by the parties or conceded by a party, petitioners have not presented any evidence with respect to the remaining adjustments.[121] Accordingly, petitioners have not met their burden regarding the remaining adjustments.

VII. Additions to Tax and Penalties

The Commissioner determined section 6651(a)(1) additions to tax and section 6656(a) penalties against Beekman. The Commissioner asserted a section 6662(a) accuracy-related penalty against Dynamo. We have separately concluded that the Commissioner does not bear the burden of production as to the penalties at issue in these proceedings.[122] He does, however, bear the burden of proof as to those penalties raised in his amendment to answer for Beekman.

A. Section 6651(a)(1) and Section 6656

Section 6651(a)(1) imposes an addition to tax for failing to timely file a tax return unless the taxpayer shows that the failure is due to reasonable cause and not

---

[121]See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

[122]Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. ___ (May 7, 2018).

[*107] due to willful neglect. This penalty applies to returns required under section 6011, among others. Forms 1042 fall under section 6011.[123]

Section 6656(a) imposes a penalty for failure to deposit any amount of tax with a Government depository. For failures to deposit for more than 15 days, the penalty is equal to 10% of the underpayment.[124] As is true with respect to the addition to tax under section 6651(a)(1), a taxpayer may avoid a penalty under section 6656(a) if the taxpayer's failure to make a required deposit was due to reasonable cause and not willful neglect.[125]

Except as to the portion of the section 6656 penalty raised in the Commissioner's amendment to answer, Beekman is liable for additions to tax for failure to timely file and failure to timely deposit. Beekman's Forms 1042 for the years ending December 31, 2005 and 2006, were due on March 15, 2006 and 2007, respectively.[126] Likewise, Beekman's payments of withholding tax for the years ended December 31, 2005 and 2006, were due by March 15, 2006 and 2007,

---

[123]See secs. 1.6011-1(c), 1.1461-1(b)(1), Income Tax Regs.

[124]Sec. 6656(b)(1)(A)(iii).

[125]Rogers v. Commissioner, T.C. Memo. 2016-152, at *11-*12 (explaining that because section 6651(a)(1) and section 6656(a) are identical, they may be addressed together).

[126]See sec. 1.1461-1(b), Income Tax Regs.

[*108] respectively.[127]  Beekman did not file Forms 1042 or pay deposits before 2009.

The Commissioner bears the burden of proof with respect to any increase in penalties and additions to tax asserted in the amendment to answer above those determined in the notice of deficiency.[128]  In the case of penalties under section 6656(a), that burden includes written supervisory approval of penalties under section 6751(b)(1).  The Commissioner has not offered any evidence of supervisory approval for the increase in penalties under section 6656(a) asserted in the amendment to answer.  The Commissioner has not met his burden.

In contrast, additions to tax under section 6651(a)(1) are not subject to supervisory approval under section 6751(b)(1); consequently, the lack of supervisory approval is not fatal for the amounts of the increases in additions to tax under section 6651(a)(1).[129]  The record shows that Beekman did not timely file its returns for 2005 and 2006 and has not shown that the failure to file was due to reasonable cause and not willful neglect.  Consequently, it is liable for the additions to tax asserted in the amendment to answer.

---

[127]Sec. 6151(a).

[128]Rader v. Commissioner, 143 T.C. at 389.

[129]Sec. 6751(b)(2)(A).

[*109] Petitioners argue that the Commissioner is precluded from asserting a section 6651(a)(1) addition to tax or a section 6656(a) penalty because the revenue agent initially found reasonable cause during Beekman's examination. Petitioners rely on Estate of Charania v. Shulman.[130] In Estate of Charania, the Court of Appeals for the First Circuit reversed our decision and held that the addition to tax should have been abated because a portion of the penalty was abated during examination.[131] We do not believe that the holding in Estate of Charania is analogous to Beekman's situation. In these cases, there was no abatement. Moreover, we follow our jurisprudence when the court to which an appeal would lie has not ruled on the issue.[132]

Petitioners' argument that the Commissioner cannot change his mind about whether to determine additions to tax or penalties in a notice of deficiency has no merit. Petitioners have neither established, nor attempted to establish, the existence of a closing agreement or any other binding agreement that would preclude the Commissioner from subsequently determining an addition to tax or a

---

[130]Estate of Charania v. Shulman, 608 F.3d 67 (1st Cir. 2010), aff'g in part, rev'g in part 133 T.C. 122 (2009).

[131]Estate of Charania v. Shulman, 608 F.3d at 76-77.

[132]Lardas v. Commissioner, 99 T.C. 490, 493-495 (1992).

[*110] penalty.[133]  We will not normally look behind the notice of deficiency to examine the administrative actions, motives, or policies of the Commissioner.[134] Thus, we will not look into the revenue agent's alleged initial decision to not impose any section 6651(a)(1) addition to tax or section 6656(a) penalty. Accordingly, we conclude that respondent did not exceed his statutory authority when determining additions to tax under section 6651(a)(1) and penalties under section 6656(a).

The parties dispute whether Dynamo and Beekman had reasonable cause for failure to timely file and timely deposit because they did not believe any distribution had occurred.  The record is clear, however, that they did not have reasonable cause for their failure to timely file or deposit.  Reasonable cause requires that a taxpayer exercise ordinary business care and prudence.[135]  We have previously explained that "[a] good-faith belief that one is not required to file a return does not constitute reasonable cause under section 6651(a)(1), unless bolstered by advice from competent tax counsel who has been informed of all the

---

[133]Estate of Wilbanks v. Commissioner, 94 T.C. 306, 315 (1990).

[134]Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974).

[135]United States v. Boyle, 469 U.S. 241, 246 (1985); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

[*111] relevant facts."[136]  The management team did not request advice on how to

report the property transfers.  We do not find that Dynamo and Beekman acted

with reasonable cause and not willful neglect.

B.    Section 6662(a)

The tax treatment of any partnership item, including the applicability of any

penalty and addition to tax that relates to an adjustment to a "partnership item", is

determined at the partnership level.  We have jurisdiction to determine the

applicability of an accuracy-related penalty that relates to an adjustment to a

partnership item.[137]

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty

on any portion of an underpayment of tax that is due to negligence or disregard of

rules or regulations or a substantial understatement of income tax.  The term

"negligence" includes any failure to make a reasonable attempt to comply with the

provisions of the Code, and the term "disregard" includes any careless, reckless, or

intentional disregard.[138]  A return position that has a reasonable basis is not

---

[136]Vinz v. Commissioner, T.C. Memo. 1984-84, 47 T.C.M. (CCH) 1128, 1129 (1984).

[137]Sec. 6226(f); United States v. Woods, 571 U.S. 31, 41 (2013).

[138]Sec. 6662(c); Higbee v. Commissioner, 116 T.C. 438, 448 (2001).

**[\*112]** attributable to negligence.[139]  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[140]  An understatement of income tax is "substantial" when it exceeds the greater of 10% of the tax required to be shown on the return or $5,000 or, in the case of a corporation other than an S corporation, if the amount exceeds the lesser of 10% of the tax required to be shown on the return (or, if greater, $10,000) or $10,000,000.[141]

Dynamo Holdings was negligent in failing to report the deemed distribution to Dynamo GP.  We have found the advances were recourse as to Dynamo GP and Dynamo GP received a deemed distribution as a result of the assumption of the liabilities by the dynasty trusts.  Dynamo did not report the distribution on its return.  Accordingly, Dynamo was careless when it did not ascertain the correctness of excluding the distribution from its return.

With respect to the remaining adjustments, Dynamo Holdings failed to introduce evidence that it had a reasonable basis for its reporting of the items that were agreed during Dynamo's examination.  Petitioners allege that adjustments

---

[139]Sec. 1.6662-3(b)(1), Income Tax Regs.

[140]Sec. 1.6662-3(b)(2), Income Tax Regs.

[141]Sec. 6662(d)(1)(A) and (B).

**[\*113]** resulting from the parties' agreements were isolated computational adjustments. They allege that because the amount of one of the adjustments was only 5% of the overall deficiency, we should find it was a computational error. The size of the adjustment alone is not evidence of a reasonable basis. Thus, the negligence penalty is sustained as to those items, as well.

The substantial understatement penalty may be applicable if an understatement of tax that is attributable to an adjustment to a partnership item meets the threshold.[142] Accordingly, we provisionally sustain the Commissioner's section 6662(b)(2) accuracy-related penalty as to Dynamo holdings on any portion of an underpayment of tax that is due to a substantial understatement of income tax.

The accuracy-related penalty will not apply to any portion of an underpayment where the taxpayers establish that they had reasonable cause and acted in good faith.[143]

---

[142]Sec. 6221; <u>VisionMonitor Software, LLC v. Commissioner</u>, T.C. Memo. 2014-182, at \*16.

[143]Sec. 6664(c)(1); <u>Higbee v. Commissioner</u>, 116 T.C. at 448; <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 98 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

[*114] Petitioners allege that Dynamo Holdings had reasonable cause and acted in good faith. But the defense centers on Mr. Julien's knowledge. In particular, petitioners note that Mr. Julien was "undeniably Canadian-born and raised" and "would be expected to be unfamiliar with esoteric IRS constructs". This defense is personal to Mr. Julien, and a reasonable cause defense that is personal to a partner may not be asserted in a partnership-level proceeding.[144] Petitioners, a U.S. corporation and the tax matters partner of a U.S. partnership, were not Canadian born and raised and petitioners' argument does not establish reasonable cause at the entity level for either Dynamo Holdings or Beekman Vista.

## VIII. Other Arguments

Petitioners raise additional arguments that do not survive scrutiny. Petitioners argue that Dynamo Holdings' and Beekman Vista's due process rights were violated because they were denied an administrative appeal. However, we have previously held that the Commissioner's decision to not provide an Appeals Office conference does not invalidate a notice of deficiency or an FPAA.[145]

---

[144]RERI Holdings I, LLC v. Commissioner, 149 T.C. __, __ (slip op. at 31) (July 3, 2017); sec. 301.6221-1(d), Proced. & Admin. Regs.

[145]Cupp v. Commissioner, 65 T.C. 68, 83 (1975), aff'd without published opinion, 559 F.2d 1207 (3d Cir. 1977).

[*115] Petitioners also allege that the notice of deficiency and the FPAA are invalid under the Administrative Procedure Act because the Commissioner did not provide a "reasoned explanation for * * * [his] actions." The Administrative Procedure Act does not apply to these notices.[146]

IX.  Conclusion

Beekman and Dynamo entered into a bona fide debtor-creditor relationship. However, Beekman transferred property to Dynamo at less than fair market value. Because of that underpricing, Beekman made a constructive distribution to Mrs. Moog. Beekman was required to but failed to withhold taxes. Mrs. Moog is deemed to have given the constructive distribution to the dynasty trusts and the dynasty trusts are deemed to have contributed that amount to Dynamo. Dynamo engaged in a restructuring transaction in which each partner received a distribution. Dynamo GP's distribution occurred because the dynasty trusts assumed its liability, and the dynasty trusts' contribution occurred because they assumed the liability. Beekman Vista is liable for additions to tax for failure to timely file, and except as to the amount asserted in the Commissioner's amendment to answer, Beekman Vista is also liable for penalties for failure to

---

[146]Commissioner v. Neal, 557 F.3d 1262, 1275 (11th Cir. 2009), aff'g T.C. Memo. 2005-201; Porter v. Commissioner, 130 T.C. 115, 117-118 (2008).

**[*116]** deposit.  Beekman Vista did not establish a defense against the additions to tax or penalties.  The Commissioner established an accuracy-related penalty under section 6662(a) for negligence with respect to the portion of each underpayment arising from the distribution from Dynamo Holdings, and Dynamo Holdings did not establish a defense.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.